[No. B142250. Second Dist., Div. Four. July 20, 2001.]

THE PEOPLE, Plaintiff and Respondent, v.
JAVIER SOLIS, Defendant and Appellant.

## COUNSEL

David B. Harrison, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, David P. Druliner, Chief Assistant Attorney General, Carol Wendelin Pollack, Assistant Attorney General, William T. Harter and Michael R. Johnsen, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

## VOGEL (C. S.) P. J.—

### INTRODUCTION

In a bifurcated trial, a jury first convicted defendant Javier Solis of one count of arson and two counts of making terrorist threats and then found he had suffered a prior conviction within the meaning of the "Three Strikes" law as well as Penal Code section 667, subdivision (a)(1)[1] and had served a prison term for that conviction (§ 667.5, subd. (b)). The trial court sentenced him to state prison for 24 years and eight months.

Defendant raises multiple contentions. He attacks the sufficiency of the evidence to sustain the arson conviction and the finding he suffered the prior conviction. He claims the trial court improperly answered the jury's questions about the elements of the offense of making terrorist threats and improperly instructed the jury in the second phase of the trial. In regard to sentencing, he advances several arguments as to why section 654 has been violated. Other than one minor sentencing claim about an enhancement imposed for the prior conviction, we reject all of defendant's contentions.

### FACTUAL BACKGROUND TO THE CRIMES

The victims of the crimes are Heather Amos and Adrienne Garcia. The two women shared an apartment. Garcia had been defendant's girlfriend. At the time of these events, Garcia and defendant were ending their relationship.

---

[1]All subsequent statutory references are to the Penal Code unless stated otherwise.

On April 23, 1999, defendant left a message on the women's answering machine. In a message laced with profanity, defendant warned Garcia that if she did not retrieve some of her property from him, he would throw the items in an alley.

On April 24, 1999, defendant left several more messages on the victims' answering machine, all of which they heard for the first time at approximately midnight. These messages form the basis of his convictions for making terrorist threats. The first message said: "Adrian, answer the phone. I'm on my way. Don't make me go over there." The second message said: "Hey, it's me. I'm out here at Cherry and Pacific. I'm on my way to your house so you better be afraid because when I get there I'm going to kill you. You hear me. I'm going to fucking kill you, all of you. I don't give a fuck who it is in the house. I'm on my way, so you better stop me. You better call fucking the cops, better call 911, because I'm on my way. I'm right here on fucking PCH and Spring/Cherry, so you better fucking stop me, Adrian. You are going to meet your fucking worse nightmare. Bye, Bitch." In the last message, defendant said: "Hey, Bitch, I'm on Redondo. I'm coming for you. You're going to die. You understand you're going to die. I'm going to kill you. I'm going to kill fucking everybody. Your whole place is going to burn to hell. Die." After the women heard these messages they became very frightened and feared for their safety. They immediately left the apartment to find defendant in an effort to stop him. They took Amos's car and drove past defendant's house but did not see him there. An hour later, they returned to their apartment and found it was on fire. The primary damage was in Garcia's bedroom. The window had been broken and a rock was found on the floor below the window.

Long Beach Fire Investigator Lee Anthony examined the scene. He concluded the fire was intentionally set, using an accelerant which had been introduced by the rock that had been thrown through the bedroom window. A laboratory test disclosed the accelerant had diesel properties. Anthony's subsequent investigation revealed that there were many trucks using diesel fuel at defendant's place of employment. Some of the trucks' fuel tanks were unlocked and accessible.

At the scene of the fire, both Amos and Garcia told Anthony that they were afraid of defendant because he had a bad temper and had been a gang member. Amos gave Anthony the tape from the answering machine containing defendant's threats. Garcia, who was crying, told Anthony she was very upset and afraid. She identified defendant as the person who left the messages and stated she believed he was responsible for the fire. She asked Anthony to check her car for explosives.

At approximately 2:30 a.m. (several hours after the fire had been set), defendant called the police to report a burglary. Defendant was interviewed by Long Beach Police Officer Scott Destefano. Officer Destefano smelled alcohol on defendant's breath but characterized him as "coherent and cognizant of what was going on." Defendant told the officer he had been drinking and playing pool at a bar. When asked if he smelled gasoline or diesel fuel on defendant, the officer replied: "I don't recall that."

## Discussion

### A. *Sufficiency of the Evidence to Support the Arson Conviction*

■ Defendant contends that "[a]lthough the evidence was incriminating against [him] . . . , it was not sufficient to constitute substantial evidence." Essentially he claims there is insufficient evidence to establish his identity as the perpetrator of the arson. He references various cases in which a reviewing court found that certain factors were sufficient to uphold a jury's verdict and then claims that the absence of any of those factors is fatal. Defendant's approach is analytically incorrect. The particular evidence offered to prove the charge must, by necessity, vary from case to case. Accordingly, there can be no checklist of evidence required to prove the crime. Instead, all that is constitutionally required is that the People prove each and every element of the crime beyond a reasonable doubt and that the jury's verdict be supported by substantial evidence. With that framework in mind, we reject defendant's contention of insufficient evidence.

■ Arson is a general intent crime. (*People v. Atkins* (2001) 25 Cal.4th 76, 84 [104 Cal.Rptr.2d 738, 18 P.3d 660].) As charged in the information, the People were required to establish defendant set fire to and caused to be burned an inhabited structure. (§ 451, subd. (b).) The statutory requirement that the act be done willfully and maliciously "ensures that the setting of the fire must be a deliberate and intentional act, as distinguished from an accidental or unintentional ignition or act of setting a fire; ' "in short, a fire of incendiary origin." ' [Citations.]" (*People v. Atkins, supra,* 25 Cal.4th at p. 88.) "[T]he very nature of the crime of arson ordinarily dictates that the evidence will be circumstantial. [Citation.]" (*People v. Beagle* (1972) 6 Cal.3d 441, 449 [99 Cal.Rptr. 313, 492 P.2d 1].) Consequently, the lack of an eyewitness placing defendant at the scene or other direct evidence to establish his guilt does not render the jury's verdict of guilty of arson constitutionally deficient. (*People v. Maler* (1972) 23 Cal.App.3d 973, 983 [100 Cal.Rptr. 650].)

■ The testimony of the fire investigator established the fire was set intentionally. In regard to defendant's identity as the person who started that

fire, a plethora of evidence was offered. He had access at his jobsite to diesel fuel, the accelerant used to start the fire. His intent was shown through the threatening messages he left shortly before the fire on the victim's answering machine, messages which included the statement: "Your whole place is going to burn to hell." And defendant had a motive to commit the crime: the acrimonious dissolution of his relationship with Garcia. Based upon these facts, a rational jury could conclude beyond a reasonable doubt defendant committed the arson. In sum, substantial evidence supports the jury's verdict.

## B. *Court's Answers to the Jury's Questions*

█ Defendant contends that the trial court "misinstructed the jury on the two counts of commission of terrorist threats (section 422) in response to several jury questions. These errors were prejudicial, requiring reversal on those counts." We reject the contention.

*Factual Background*

The court submitted the standard instruction (CALJIC No. 9.94 (1999 rev.) (6th ed. 1996)) to explain the elements of making terrorists threats.

The instruction provides:

"[Defendant is accused [in Count[s] 2 & 3] of having violated Section 422 of the Penal Code, a crime.]

"Every person who willfully threatens to commit a crime which will result in death or great bodily injury to another person, with the specific intent that the statement made verbally, in writing, or by means of an electronic communication device, is to be taken as a threat, even if there is no intent of actually carrying it out, *which threat, on its face and under the circumstances in which it is made*, is so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat, and thereby causes that person reasonably to be in sustained fear for his or her own safety or for his or her immediate family's safety, is guilty of a violation of Penal Code Section 422, a crime. ['Great bodily injury' means significant or substantial bodily injury or damage; it does not refer to trivial, insignificant, or moderate injury or harm.]

"['Immediate family' means any spouse, whether by marriage or not, parent, child[], or any other person who regularly resides in the household, or who, within the prior six months, regularly resided in the household.]

"['Electronic communication device' includes, but is not limited to, telephones, cellular telephones, computers, video recorders, fax machines, or pagers.]

"In order to prove this crime, each of the following elements must be proved:

"1. A person willfully threatened to commit a crime which if committed would result in death or great bodily injury to another person;

"2. The person who made the threat did so with the specific intent that the statement be taken as a threat;

"3. The threat was contained in a statement that was made verbally, in writing, or by means of an electronic communication device;

"4. *The threatening statement on its face, and under the circumstances in which it was made*, was so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat; and

"5. *The threatening statement caused the other person reasonably to be in sustained fear [for her own safety] [or] [her immediate family's safety].*

"It is immaterial whether the person who made the threat actually intended to carry it out." (Italics added.)

During the second day of deliberations, the jury sent the court the following written questions.

"Does the threatening statement have to be the sole cause of the fear for her safety?

"If a statement not considered as a threat i[ni]tially be later considered as threat as a result of an event or action?

" 'The threatening statement cause the other person reasonably to be in sustained fear for her own safety or her immediate family.' (Need more explanation)

"If not considered threat at first is it still considered a threat at a later time?"

The court conferred with both attorneys. Over defense counsel's objection, the court told the jury that the threatening statement does not have to be

the sole cause of the victim's fear for her safety and that a statement the victim does not initially consider a threat can later be considered a threat because of a subsequent action or event. The court admonished the jury: "I want to caution you that with the brief answers that I gave to you presuppose that you will follow CALJIC Instruction [No.] 9.94 which is the one that sets forth the elements of the offense, and I want to emphasize that before defendant can be found guilty of that offense, each and every element set forth has to be met." The court then asked for clarification of the third question. The foreperson responded: "We just wanted [*sic*] if you could explain it a little bit more in-depth, just 'sustained,' the 'sustained' word basically." The court answered: "Counsel thought that's what you were asking about. I can't give you an explanation for 'sustained.' You will apply that term using the evidence in the case. You have to make that determination whether the evidence shows any fear is sustained or not. Sorry, I can't be of more assistance to you, but that's your job, and I'll send you back to your deliberations, then."

*Discussion*

Several appellate decisions have held, in the context of determining whether conditional, vague, or ambiguous language could be the predicate for a conviction of making terrorist threats, that all of the surrounding circumstances should be taken into account to determine if a threat falls within the proscription of section 422. This includes the defendant's mannerisms, affect, and actions involved in making the threat as well as subsequent actions taken by the defendant. The courts have taken this approach in order to further the legislative intent behind the statute. "In enacting section 422 . . . , the Legislature declared that every person has the right to be protected from fear and intimidation. This act was in response to the growing number and severity of threats against peaceful citizens." (*People v. Martinez* (1997) 53 Cal.App.4th 1212, 1221 [62 Cal.Rptr.2d 303].)

For instance, in *People v. Martinez, supra,* 53 Cal.App.4th 1212, the defendant claimed the language of his threat was vague and did not specifically convey a threat of great bodily injury or death. The appellate court conceded his threat may not have, by itself, conveyed a threat to commit great bodily injury or death but held that the trier of fact could consider all of the surrounding circumstances in deciding whether a terrorist threat had been made. In that case, the defendant set fire to a building where the victim worked a day after the defendant had made the threat. The court held the jury could properly consider that fact. It reasoned: "Defendant's activities after the threat give meaning to the words and imply that he meant serious business when he made the threat." (*Id.* at p. 1221, fn. omitted.)

In *People v. Mendoza* (1997) 59 Cal.App.4th 1333 [69 Cal.Rptr.2d 728], a similar result was reached. The appellate court agreed that while the words themselves did not constitute a terrorist threat, the jury could consider all of the surrounding circumstances, including the parties' history and subsequent actions taken by the defendant. In that case, less than 30 minutes after the threat was made, members of the defendant's gang parked their car in front of the victim's home and honked the horn to gain her attention. (*Id.* at pp. 1341-1343.)

In light of these decisions, it is clear a jury can properly consider a later action taken by a defendant in evaluating whether the crime of making a terrorist threat has been committed. The fact that in those cases the verbal threat was vague or ambiguous whereas in this case the threats left by defendant on the answering machine were not ambiguous is not dispositive. The point is that all of the circumstances can and should be considered in determining whether a terrorist threat has been made. It therefore follows that the court, in response to the jury's questions, properly informed the jury that the threatening statement does not have to be the sole cause of the victim's fear and that a statement the victim does not initially consider a threat can later be seen that way based upon a subsequent action taken by a defendant (e.g., setting fire to the victims' apartment).[2]

■ The issue posed by the trial court's decision not to define "sustained" is more problematic. When the trial court initially instructed the jury, it submitted an instruction which essentially tracked the language of the statute (§ 422) prohibiting the making of a terrorist threat. This was proper. ■ "The language of a statute defining a crime . . . is generally an appropriate and desirable basis for an instruction, and is ordinarily sufficient when the defendant fails to request amplification. If the jury would have no difficulty in understanding the statute without guidance, the court need do no more than instruct in statutory language." (*People v. Poggi* (1988) 45 Cal.3d 306, 327 [246 Cal.Rptr. 886, 753 P.2d 1082].) ■ At that point defense counsel made no request for a further definition of "sustained." Consequently, the court had no sua sponte obligation to define that word because it is a commonly understood word and was not being used in a technical

---

[2]When the trial judge discussed the questions with counsel and stated he would tell the jury that subsequent actions could be considered he explained his reasoning as follows: "The reason I am so interpreting it here is that this is an unusual case where part of the threat is the statement that, 'I'm on my way, I'm on my way, I'm on my way,' so it's the defendant's actions as well as his words that constitute the threat here, and under paragraph three [of CALJIC No. 9.94], the jurors are to consider the circumstances under which the threat is made, and part of the circumstances under which the threat is made is that the defendant is saying he's on his way, so I believe that when he does arrive and sets the fire, that's part of the circumstances of the threat to kill and injure everyone at that location . . . ."

sense peculiar to the law. (See, e.g., *People v. Estrada* (1995) 11 Cal.4th 568, 574-575 [46 Cal.Rptr.2d 586, 904 P.2d 1197].)

However, when the jury subsequently sent a request for further clarification of the word, section 1138 was triggered. The statute provides, in part: "After the jury have retired for deliberation, . . . if they desire to be informed on any point of law arising in the case, they must require the officer to conduct them into court. Upon being brought into court, the information required must be given . . . ." █ This means the trial "court has a primary duty to help the jury understand the legal principles it is asked to apply. [Citation.] This does not mean the court must always elaborate on the standard instructions. Where the original instructions are themselves full and complete, the court has discretion under section 1138 to determine what additional explanations are sufficient to satisfy the jury's request for information. [Citation.] Indeed, comments diverging from the standard are often risky. [Citation.]" (*People v. Beardslee* (1991) 53 Cal.3d 68, 97 [279 Cal.Rptr. 276, 806 P.2d 1311].) However, "[a] definition of a commonly used term may nevertheless be required if the jury exhibits confusion over the term's meaning. [Citation.]" (5 Witkin & Epstein, Cal. Criminal Law (3d ed. 2000) Criminal Trial, § 633, p. 906.)

█ In this case, the court, over defense counsel's objection,[3] declined to give any further explanation of the word, be that one found in a dictionary or case law. As our Supreme Court noted in a somewhat similar situation, "[t]he trial court was understandably reluctant to strike out on its own. But a court must do more than figuratively throw up its hands and tell the jury it cannot help." (*People v. Beardslee, supra,* 53 Cal.3d at p. 97.) This error, however, does not require reversal unless defendant can establish prejudice under the *Watson*[4] test. (*Beardslee,* at p. 97.) That is, he must show it is reasonably probable he would have obtained a more favorable result (acquittal of the charges of making terrorist threats) had the error (failure to further define "sustained") not occurred. Defendant has failed to make that showing.

As defendant correctly notes, several years before his trial was conducted one appellate court did define "sustained." It wrote: "[W]e find that it means a period of time that extends beyond what is momentary, fleeting, or transitory." (*People v. Allen* (1995) 33 Cal.App.4th 1149, 1156 [40

---

[3]Before the jury was brought out, the court stated: "I don't plan on giving any explanation of what sustained fear is. They will have to decide that." Defense counsel objected but did not offer any specific suggestion(s) to the contrary.

[4]*People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].

Cal.Rptr.2d 7].) This definition[5] was rendered in the context of evaluating a contention that the evidence was insufficient to sustain a conviction for making a terrorist threat, not in the context of determining the scope of a trial court's duty to instruct on the elements of the offense. Nonetheless, the case is helpful because it furnishes a definition for "sustain" that assists in determining if the error was prejudicial.

To establish prejudicial error, defendant urges: "Any fear that the victims suffered as a result of the statement itself clearly did not exceed [an] amount of time" greater than a momentary, fleeting or transitory period. In other words, defendant argues that unless the jury was instructed that the victims' fear had to exist for more than a transitory period, there is a real danger the jury convicted him for causing only a momentary or fleeting fear. This argument fails because it flies in the face of the manner in which the case was actually tried and argued to the jury.

In closing argument, defense counsel made a multifaceted attack on the terrorist threat charges. He relied primarily upon Garcia's trial testimony in which she recanted many of her earlier statements to the police incriminating defendant and in which she minimized the impact of the threats upon her. (The prosecutor impeached Garcia's trial testimony with testimony from Amos and Anthony about Garcia's actions and statements the night the crimes occurred.)[6] Defense counsel essentially argued the crimes did not occur because either defendant was not the individual who left the threatening messages or because the victims realized the threats were not serious and therefore were never in fear. He did *not* argue the victims' fear was so fleeting or transitory to preclude the commission of the crimes. The prosecutor, on the other hand, argued defendant was the person who left the messages and that the victims' statements and actions that night demonstrated a substantial fear that spanned at least an hour. In convicting defendant, the jury rejected the defense arguments and credited the prosecutor's theory of the case. Given this dichotomy, it is not reasonably probable defendant would have been acquitted of committing terrorist threats had the court defined "sustained" for the jury.

### C. *The Prior Conviction*

 In a bifurcated proceeding, the jury found defendant had been convicted in August 1994 of assault with a deadly weapon in case No.

---

[5] In the trial court, defense counsel never brought this case to the judge's attention. (See fn. 3, *ante.*)

[6] At trial, Garcia testified that when she first heard the messages, she laughed and thought it was a joke. Garcia was impeached by Amos, who testified that when the two first heard the messages, Garcia became hysterical and started to cry.

BA095349 and that he had either personally used a dangerous or deadly weapon to commit that crime or had personally inflicted great bodily injury on the victim of that crime. The prior was alleged pursuant to the Three Strikes law as well as sections 667, subdivision (a)(1) and 667.5, subdivision (b).

Defendant contends that the prosecution improperly utilized a preliminary hearing transcript to prove the prior; that the evidence is insufficient to sustain the jury's finding the conviction was a prior conviction within the meaning of the Three Strikes law; and that the jury was improperly instructed about the burden of proof in regard to making its decision. We find no merit to any of these contentions.

*Factual Background*

To prove the prior conviction, the People offered a certified packet from the Department of Corrections which contained an abstract of judgment, a set of fingerprints, a photograph, and a chronological movement history. (See § 969b.) An expert witness testified the fingerprints were those of defendant. Another witness testified that according to these records, defendant pled guilty in August 1994 to assault with a deadly weapon and had been imprisoned for that crime from August 1994 to March 1998. In addition, the prosecutor offered a certified copy of the transcript of the May 23, 1994 preliminary hearing conducted on the assault charge. A portion of the transcript was read to the jury in which the victim (Eliseo Cortez) testified that defendant, who the victim had previously seen, approached him and then stabbed him in the stomach with a knife with a four-inch blade, resulting in a two-week hospitalization. After the attack, defendant ran away. Defense counsel then had the following colloquy from the victim's testimony read:

"Question: Tell us what happened when you saw the defendant.

"Answer [Cortez, the victim]: I was talking to his cousin, and he just came and stabbed me.

"Question: When you say 'he,' do you mean the defendant or the cousin?

"Answer: No, his cousin, this guy right here.

"Question: This man in court today?

"Answer: Yes."

To the extent relevant to the issues raised on this appeal, defense counsel's closing argument used the above testimony to urge the prosecutor had

not established that defendant, *as opposed to his cousin,* was the person who had actually stabbed Cortez.

As noted earlier, the jury found true all of the allegations in regard to the prior conviction.

*Discussion*

At the time defendant committed these crimes, assault with a deadly weapon was not designated a serious felony within the meaning of the Three Strikes law.[7] Accordingly, a prior conviction for a violation of section 245 could only qualify as a strike if defendant either *personally* inflicted great bodily injury or *personally* used a dangerous or deadly weapon while committing the crime. (§ 1192.7, subd. (c)(8) and (c)(23).) Consequently, a conviction could not be considered a strike if it was based on a theory of aiding and abetting. (*People v. Rodriguez* (1998) 17 Cal.4th 253, 261 [70 Cal.Rptr.2d 334, 949 P.2d 31].)

Defendant first contends that the trial "court violated due process in utilizing the preliminary hearing transcript" to determine if the conviction was for a "serious felony." Precedent is squarely to the contrary. In *People v. Reed* (1996) 13 Cal.4th 217 [52 Cal.Rptr.2d 106, 914 P.2d 184], our Supreme Court unanimously concluded that the prosecution can use the transcript of a preliminary hearing to prove a conviction constitutes a "serious felony." (Accord, *People v. Blackburn* (1999) 72 Cal.App.4th 1520, 1531 [86 Cal.Rptr.2d 134].) The hearsay objections are overcome because the certified transcript, introduced to prove the events of the prior proceeding, falls within the official records exception (Evid. Code, § 1280) and the testimony of the witnesses (in this instance the victim Cortez) falls within the former testimony exception (Evid. Code, § 1291, subd. (a)). (*People v. Reed, supra,* 13 Cal.4th at pp. 225-228.) And the use of the preliminary hearing transcript does not violate the due process right to confront witnesses. (*Id.* at p. 228.)

Notwithstanding this authority, which is binding upon us as an intermediate court (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450 [20 Cal.Rptr. 321, 369 P.2d 937]), defendant maintains the transcript of a preliminary hearing does not reliably reflect the facts underlying the prior conviction. Our Supreme Court expressly held to the contrary. It reasoned: "[T]he procedural protections afforded the defendant during a preliminary hearing tend to ensure the reliability of such evidence. Those protections

---

[7]In March 2000, section 1192.7 was amended to include subdivision (c)(31), which defines assault with a deadly weapon as a serious felony.

include the right to confront and cross-examine witnesses and the requirement those witnesses testify under oath, coupled with the accuracy afforded by the court reporter's verbatim reporting of the proceedings." (*People v. Reed, supra,* 13 Cal.4th at p. 223.) The fact that in a particular case a defendant may choose not to extensively cross-examine a prosecution witness does not detract from that conclusion. It is the right to do so which renders a transcript of the hearing reliable.

In his reply brief, defendant raises for the first time the claim that even if use of the preliminary hearing transcript was proper, it does not constitute substantial evidence to support the jury's finding that he either personally used a deadly weapon (a knife) or inflicted great bodily injury. He relies upon the victim's ambiguous testimony about defendant's cousin, testimony which we set forth above. This was an issue addressed in the parties' closing argument. By finding the allegations true, the jury credited the portion of the victim's testimony in which he explicitly stated defendant had stabbed him and accepted the prosecutor's explanation for the ambiguity.[8] We will not disturb that determination.

█ Lastly, defendant urges the jury findings about the prior conviction must be reversed because the jury was not adequately instructed about the prosecutor's burden to prove the conviction beyond a reasonable doubt. We disagree.

When the trial on the prior conviction began, the court first correctly explained to the jury each of the specific allegations it would be called upon to decide and then stated: "The purpose of this separate trial then is to determine whether the prosecution can prove each element of each allegation beyond a reasonable doubt."

After the very brief trial was conducted, the court instructed the jury. In part, it explained: "It is also alleged in the information that the defendant Javier Solis previously has been convicted of a violation of Penal Code section 245(a)(1) on August 2nd, 1994, and that the defendant personally used a dangerous or deadly weapon or personally inflicted great bodily injury in the commission of that prior felony. You must now determine the truth of that—of this allegation. . . . *The People have the burden of proving the truth of this allegation. If you have a reasonable doubt as to whether such*

---

[8]The prosecutor argued: "[A]pparently the defendant was also with his cousin at the time, and there was a little bit of confusion, but the court tries to clarify who he's referring to; and what is clear is specifically that he discusses and mentions the person specifically in court, which was the defendant at the time, that did that; and it's consistent with what's done in the rest and what the defendant, in fact, personally pled guilty to, assault with a deadly weapon."

*alleged prior conviction is true, you must find the allegation to be not true.*"[9] (Italics added.)

Defendant now argues the court's instruction was deficient because the jury was not informed "that it also must acquit [defendant] if it had a reasonable doubt about whether [he] personally used a dangerous or deadly weapon or inflicted great bodily injury." We are not persuaded.

 "[T]he question is whether there is a 'reasonable likelihood' that the jury understood the charge as the defendant asserts. [Citations.] 'In addressing this question, we consider the specific language under challenge and, if necessary, the charge in its entirety. [Citation.] Finally, we determine whether the instruction, so understood, states the applicable law correctly.' [Citation.]" (*People v. Kelly* (1992) 1 Cal.4th 495, 525-526 [3 Cal.Rptr.2d 677, 822 P.2d 385].)

 In this case, the jury was correctly instructed at the beginning of the very short trial on the prior conviction that the prosecutor had the burden of proving beyond a reasonable doubt each specified allegation in regard to the prior conviction. At the close of the trial, the jury was instructed that if it had a reasonable doubt as to whether the People had proven the allegation of the prior conviction, it was required to find the allegation "not true." On this record (in which no other burden of proof was mentioned in closing argument) we do not believe there is a reasonable likelihood that the jury did not recognize that it had to find beyond a reasonable doubt the allegations that defendant personally used a deadly weapon and inflicted great bodily injury in committing the assault.

### D. *Sentencing*

*Factual Background*

Insofar as is relevant to the issues raised on this appeal, the court selected the arson charge as the base term and sentenced defendant to consecutive sentences for each conviction of making terrorist threats. Because the prior conviction rendered this case a "second strike," it was used to double each of

---

[9]The written instruction submitted to the jury states, in pertinent part: "It is also alleged in the information that the defendant Javier Solis previously has been convicted of a violation of PC 245(a)(1) on Aug. 2, 1994, and that the defendant personally used a dangerous or deadly weapon or personally inflicted great bodily injury in the commission of that prior felony. [¶] You must now determine the truth of this allegation. . . . [¶] The People have the burden of proving the truth of these allegation [*sic*]. If you have a reasonable doubt as to whether such alleged prior conviction is true, you must find the allegation to be not true. . . ." (Brackets omitted.)

those sentences, resulting in a term of 18 years and eight months. In regard to the prior conviction, a five-year enhancement was imposed pursuant to section 667, subdivision (a) and a one-year enhancement was imposed pursuant to section 667.5, subdivision (b).

*Two Enhancements for the Prior Conviction*

Defendant contends, and the Attorney General concedes pursuant to the authority of *People v. Jones* (1993) 5 Cal.4th 1142 [22 Cal.Rptr.2d 753, 857 P.2d 1163], that the trial court erred in imposing enhancements for the prior conviction pursuant both to section 667, subdivision (a)(1) and section 667.5, subdivision (b). We therefore will order the one-year enhancement stricken from defendant's sentence. (Jones, *supra*, 5 Cal.4th at p. 1153.)

*Section 654*

Defendant contends the court's imposition of consecutive sentences on his three convictions violates section 654. He advances the legal argument that the issue of determining the applicability of section 654 is for the jury, not the trial court, to decide. He also advances two distinct factual arguments as to why section 654 was violated in this case. The first is it was improper to sentence him for making terrorist threats in addition to sentencing him for arson because all three crimes had the same objective. The second is it was improper to sentence him for both counts of making terrorist threats. We find no merit to any of these claims.

"The purpose of section 654 is to prevent multiple punishment for a single act or omission, even though that act or omission violates more than one statute and thus constitutes more than one crime. Although the distinct crimes may be charged in separate counts and may result in multiple verdicts of guilt, the trial court may impose sentence for only one offense . . . ." (*People v. Liu* (1996) 46 Cal.App.4th 1119, 1135 [54 Cal.Rptr.2d 578].) However, multiple punishment is proper if the defendant entertained multiple criminal objectives which were independent of each other. (*Neal v. State of California* (1960) 55 Cal.2d 11, 19 [9 Cal.Rptr. 607, 357 P.2d 839].)

By a letter brief to which the Attorney General has responded, defendant contends, relying upon *Apprendi v. New Jersey* (2000) 530 U.S. 466 [120 S.Ct. 2348, 147 L.Ed.2d 435], the jury must decide whether section 654 applies. Our colleagues in Division Seven recently rejected an identical contention, concluding that "section 654 does not run afoul of the rule announced in *Apprendi*. The question of whether section 654 operates to 'stay' a particular sentence does not involve the determination of any fact

that could increase the penalty for a crime beyond the prescribed statutory maximum for the underlying crime. . . ." (*People v. Cleveland* (2001) 87 Cal.App.4th 263, 266 [104 Cal.Rptr.2d 641].) "Unlike the 'hate crime' provision in *Apprendi*, section 654 is not a sentencing 'enhancement.' On the contrary, it is a sentencing 'reduction' statute. Section 654 is not a mandate of constitutional law. Instead, it is a discretionary benefit provided by the Legislature to apply in those limited situations where one's culpability is less than the statutory penalty for one's crimes. Thus, when section 654 is found to apply, it effectively 'reduces' the total sentence otherwise authorized by the jury's verdict. The rule of *Apprendi*, however, only applies where the nonjury factual determination *increases* the maximum penalty beyond the statutory range authorized by the jury's verdict." (*Id. at p.* 270, italics in original [petn. for review den. on May 23, 2001].) Defendant concedes that authority but asks us to follow Justice Johnson's dissent in that case. (*Id.* at pp. 272-282.) We decline to do so and adhere to the analysis from the majority opinion. (*Id.* at pp. 268-270.)

In regard to the application of section 654 to this case, defendant first argues that all three crimes (the arson and two counts of making terrorist threats) were committed pursuant to the same objective of threatening and scaring Garcia so that it was improper to sentence him on all of them. He relies upon *People v. Mendoza, supra,* 59 Cal.App.4th 1333. That case is clearly distinguishable. There, the defendant was convicted of two crimes involving one victim: making a terrorist threat and dissuading a witness from testifying by threat of force or violence. The prosecution conceded the same conduct formed the factual basis of both convictions. (*Id.* at p. 1346.) Given that factual context, the appellate court concluded that sentencing the defendant on both convictions violated section 654. It reasoned: "[Defendant's] primary objective was to help his brother by preventing further damaging testimony from [the victim]. His objective and intent for scaring her was to dissuade her from testifying in the future. The method he employed to reach his objective was his implied threat of death or great bodily injury. Thus, his terrorist threat can only be considered incidental to his primary objective of dissuading [the victim] from testifying at his brother's upcoming trial." (*Mendoza*, at p. 1346.)

This case is completely dissimilar. Here, defendant left several threatening messages. An hour later, he set fire to the victims' apartment. This chronology indicates the crimes were divisible. In addition, they had distinct objectives: in making the terrorist threats, the defendant intended to frighten whereas in committing arson an hour later the defendant intended to burn. Because defendant committed multiple and divisible acts with distinct objectives, section 654 was not violated by sentencing him on both the arson and terrorist threat convictions.

Defendant next argues that "[e]ven if consecutive sentencing was permitted on one count [of making terrorist threats], the court clearly erred in permitting consecutive sentencing on both counts. [¶] The threats in this case were clearly not only the result of a single act but also an indivisible course of conduct." We reject the argument based upon the "multiple victim" exception to section 654.

"The purpose of the protection against multiple punishment is to insure that the defendant's punishment will be commensurate with his criminal liability. A defendant who commits an act of violence with the intent to harm more than one person or by a means likely to cause harm to several persons is more culpable than a defendant who harms only one person. For example, a defendant who chooses a means of murder that places a planeload of passengers in danger, or results in injury to many persons, is properly subject to greater punishment than a defendant who chooses a means that harms only a single person. This distinction between an act of violence against the person that violates more than one statute and such an act that harms more than one person is well settled. Section 654 is not '. . . applicable where . . . one act has two results each of which is an act of violence against the person of a separate individual.' [Citations.]" (*Neal v. State of California, supra,* 55 Cal.2d 11, 20-21.)

"[W]hether a crime constitutes an act of violence that qualifies for the multiple-victim exception to section 654 depends upon whether the crime . . . is defined to proscribe an act of violence against the person. Indeed, this is the only way that the multiple-victim exception to section 654's proscription against multiple punishment makes sense: The existence of an additional victim of the same violent act creates a separate offense, with a different item of proof, when the crime is defined in terms of an act of violence against a person. [Citation.] And the defendant 'who commits an act of violence with the intent to harm more than one person or by a means likely to cause harm to several persons is more culpable than a defendant who harms only one person.' [Citation.]" (*People v. Hall* (2000) 83 Cal.App.4th 1084, 1092-1093 [100 Cal.Rptr.2d 279].)

The dispositive question therefore is whether the crime of making a terrorist threat is an act of violence within the meaning of the above precedent. We conclude it is.

A violation of section 422 requires: (1) the defendant willfully threatens to kill or seriously injure another person; (2) the defendant has the specific intent that the listener understands the statement to be a threat; (3) the threat and the circumstances under which it was made lead the listener to

believe the defendant would immediately carry through on the threat; and (4) the threat causes the listener to suffer sustained fear based upon a reasonable belief the threat would be carried out. It is therefore apparent that to sustain a conviction for this offense, the People must prove beyond a reasonable doubt that the victim was injured. In this instance, the injury is the sustained fear. As noted above, sustained fear "means a period of time that extends beyond what is momentary, fleeting, or transitory." (*People v. Allen, supra,* 33 Cal.App.4th 1149, 1156.) "[A] person violating section 422 must intend that the victim receive and understand the threat, and the threat must be such that would cause a reasonable person to fear for the safety of himself or his family. *While the statute does not require that the violator intend to cause death or serious bodily injury to the victim, not all serious injuries are suffered to the body. The knowing infliction of mental terror is equally deserving of moral condemnation.*" (*People v. Thornton* (1992) 3 Cal.App.4th 419, 424 [4 Cal.Rptr.2d 519], italics added.) ▮ It therefore follows that a violation of section 422 constitutes an act of violence against the person within the meaning of the multiple-victim exception to section 654.

Defendant's arguments to the contrary are not persuasive. He places great emphasis on the fact that the statute on its face states that the defendant does not actually have to have the intent to carry out the threat to violate its proscription. The argument misses the mark. The statute still requires the defendant to willfully make a threat which he intends the listener to understand as a threat and which causes sustained fear in the listener. This constitutes a crime of psychic violence which, if directed at separate listeners (victims) who each sustain fear, can be punished separately.

Lastly, defendant's reliance on *People v. Hall, supra,* 83 Cal.App.4th 1084, is misplaced. There, the defendant was convicted by plea of three counts of exhibiting a firearm in the immediate presence of a peace officer. One act of brandishing a firearm was involved but because there were three officers present, defendant pled to three counts and was ultimately sentenced to three consecutive sentences. (*Id.* at p. 1087.) The Court of Appeal concluded this sentence violated section 654 because the offense of exhibiting a firearm in the immediate presence of a peace officer was not an act of violence that qualified for the multiple-victim exception to section 654. It reasoned that the crime does not include an intent to harm or the commission of an act likely to harm others. It is simply a general intent crime that requires no intent beyond that to do the prohibited act. The fact that the crime includes a potential for violence is not sufficient to qualify it as a violent crime *for the purposes of the multiple-victim exception to section 654.* (*People v. Hall, supra,* at pp. 1091-1094.) "The crime, as defined, is not committed upon the peace officers who are present, but is merely committed

in their presence. . . . [¶] . . . [¶] [T]he multiple-victim exception is just that: a multiple-victim exception, not a multiple-observer exception. Assaults have victims; exhibitions have observers. . . . [T]he crime of exhibiting a firearm under section 417, subdivision (c), does not act upon an officer, but is only committed *in the presence* of an officer." (*Id.* at p. 1096.)

Section 422 is clearly distinguishable from section 417. For one thing, it does require a victim: the listener. In addition, it requires the listener suffer injury: sustained fear. And it requires the defendant act with the specific intent that his statement be viewed as a threat. Because section 422 requires commission of an act which harms another, it is a crime of violence for purposes of the multiple-victim exception to section 654.

### DISPOSITION

The judgment is modified as follows: the one-year enhancement imposed pursuant to Penal Code section 667.5, subdivision (b) is stricken. The trial court is directed to prepare a corrected abstract of judgment and to forward a copy thereof to the Department of Corrections. As so modified, the judgment is affirmed.

Hastings, J., and Curry, J., concurred.

On August 10, 2001, the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied October 31, 2001.