Filed 11/25/14  P. v. Miller CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| THE PEOPLE, | B249695 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. NA094764) |
| v. | |
| CHRISTOPHER GREER MILLER, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Mark C. Kim, Judge.  Affirmed.

Nikoo N. Berenji, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Lance E. Winters, Senior Assistant Attorney General, Linda C. Johnson, Supervising Deputy Attorney General, and Tita Nguyen, Deputy Attorney General, for Plaintiff and Respondent.

————————————

A jury found Christopher Greer Miller guilty of one count of resisting an executive officer, and one count of making a criminal threat. Miller contends there is insufficient evidence to support his conviction for making a criminal threat, and that the trial court erred in failing to instruct on the lesser included offense of attempted criminal threat. For reasons discussed below, we conclude Miller's contentions lack merit and affirm.

## PROCEDURAL BACKGROUND

In a two count information Miller was charged with resisting an executive officer (count 1; Pen. Code, § 69[1]) and criminal threats (count 2; § 422, subd. (a)). The information also alleged that Miller suffered a prior conviction within the meaning of sections 667, subdivisions (a)(1) and (d), 667.5, subdivision (c), 1170, subdivision (h)(3), 1170.12, subdivision (b), and 1192.7. Miller pleaded not guilty and denied the special allegations.

A jury convicted Miller as charged. After trial, the prosecution conceded its inability to proceed with the prior conviction enhancement allegations, and the court granted Miller's motion to dismiss those allegations.

The trial court denied probation and sentenced Miller to a total of two years in state prison,[2] ordered him to pay various fines and fees and awarded custody credits. This appeal followed.

## FACTUAL BACKGROUND

*The prosecution's case*

On February 13, 2013, Miller, a student at Long Beach City College (LBCC), parked in a parking lot reserved for staff. Long Beach City Department Police Officers Patricia Kampa and Elizabeth Velasco, were assigned to patrol duty at LBCC on February 13. The officers' uniforms consisted of a khaki top with law enforcement patches and green pants, and each carried a gun, walkie talkie, radio and a taser. The campus was undergoing

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

[2] The trial court sentenced Miller to state prison for two years as to each count, but stayed imposition of the sentence as to count 1. (§ 654.)

2

renovation at the time, and the construction impacted student parking causing some students, including Miller, to park in the lot reserved for staff.  The officers issued a citation for Miller's improperly parked car.  As the officers left, Miller approached them yelling, cursing and demanding to know why he had received a citation.  Officer Kampa had never seen Miller before.

Miller was about 12 to 15 feet away from the officers, moving fast toward them. When he was about two or three feet away, Miller repeated, "Why the fuck did you cite me?"  Officer Kampa asked him to calm down and stop yelling, to which Miller responded, "Fuck you.  I'm not taking shit."  When Officer Kampa again told Miller to stop yelling, he responded, "Obama made you do this, didn't he."  Miller told Officer Velasco, "you look like a fucking guy," "a fucking dyke," and called Officer Kampa a "wetback."  He refused the officers' requests to calm down, and continued to yell and curse.  Miller refused the officers request for identification, instead saying, "Fuck you.  I don't have to listen to you.  I don't have to show you shit," and "You ain't shit.  You are not going to tell me what to do," and began walking away.

The officers followed Miller to a nearby building where his carpentry instructor was teaching class outdoors.  They asked the instructor for appellant's name and student identification number.  The instructor saw that Miller was upset and heard him use a lot of profanity.  The officers asked Miller to leave and told him he was violating the student conduct code by which LBCC students must abide.  Miller refused to go.  The instructor had Officer Kampa follow him to a classroom where he had Miller's information.  Miller followed along, calling Officer Kampa "a fucking wetback," and told his instructor not to "give that bitch any of my information," "Don't give her shit."

Miller followed Officer Kampa and the instructor into the empty classroom, continuing to yell profanities.  As Officer Kampa and the instructor reviewed the class roster at the front of the room, Miller angrily paced back and forth.  He profanely refused Officer Kampa's directions to sit down or to remove his hands from his pockets.  Miller had not been searched and Officer Kampa did not know what was in his pockets.  Neither officer saw

3

anything to indicate that Miller had a weapon. Miller repeatedly clenched his hands into fists when they were not in his pockets. After Officer Velasco came into the classroom, Miller continued to pace back and forth between the officers, who kept their distance. He was "mad-dogging" Officer Kampa the whole time, and adopted a fighting stance (he looked like he wanted to hurt her and his hands were spread apart and fisted). At Officer Kampa's direction, the instructor left the classroom, leaving the officers and Miller in the room.

Officer Kampa, who feared for her own and Officer Velasco's safety,[3] requested back-up units for assistance. Shortly thereafter she heard Miller mumble something to the effect that "Dorner is killing all of you mother fuckers. That is why he is killing you mother fuckers."[4] Miller was about 12 feet away from Officer Kampa. He also angrily said, "I'm going to kill you and feed you some shit." He repeated that threat several times, sometimes in a whisper and sometimes yelling it loudly. Officer Velasco heard some of the Miller's comments regarding "Dorner," and about killing Officer Kampa and feeding her shit. The instructor did not hear appellant threaten the officers. He heard Miller make statements that female officers were incapable of doing a man's job, and heard him say "shit" a couple of times. After making the threats, Miller continued to "pac[e] back and forth." Officer Kampa testified that Miller did nothing aggressively to cause her to draw her weapons. A few moments after Officer Kampa's call for assistance, several officers arrived, including Officers McCart and Moreno. Officer McCart noticed that Officers Kampa and Velasco stood 10 to 15 feet from Miller, much further away from a contacted individual than the arm's length officers typically stand. Officer Kampa opened the classroom door she had locked behind the instructor to let Officer McCart in.

Miller was angry and upset. When Officers McCart and Moreno tried to detain him, Miller kicked at them with steel-toed boots. Miller continued to struggle with the officers,

---

[3] Officer Kampa is five feet tall, 130 pounds. She testified that Miller was "a lot" taller and heavier, about five feet 10 inches, 210 pounds.

[4] At that time Officer Kampa believed the now-deceased Christopher Dorner was killing officers and had not been apprehended.

even after being taken to the ground. Five to seven officers worked together to take Miller into custody.

*The defense case*

Cournell McCullough and Kenneth Jones had known Miller for a brief time; they met through a carpentry class at LBCC and carpentry club. On February 13, they saw two officers follow Miller into a classroom adjacent to the tool room where McCullough and Jones were working. McCullough did not hear the conversation between Miller and the officers. Neither student heard Miller threaten to kill officers. McCullough did not hear anything after the classroom door was shut after the instructor left. Jones could tell that Miller was upset about a ticket and heard him say something about "[f]ucking dykes trying to do the job of a man." He heard the officers tell Miller to shut up. Jones and McCullough tried to calm Miller down before he went into the classroom. After that the officers did not let anyone talk to him.

## DISCUSSION

*1. There is substantial evidence that Officer Kampa was reasonably in sustained fear*

Miller argues there was insufficient evidence to support his conviction of making a criminal threat. Specifically, he maintains the evidence does not show Officer Kampa was reasonably in sustained fear for her safety.[5]

"'A reviewing court faced with such a claim determines "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." [Citations.] We examine the record to determine "whether it shows evidence that is reasonable, credible and of solid value from which a rational trier of fact could find the defendant guilty beyond a reasonable doubt." [Citation.] Further, "the appellate court presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." [Citation.] This standard applies whether direct or circumstantial evidence is involved.

---

[5] Miller does not take issue with his conviction for resisting an executive officer.

5

"Although it is the jury's duty to acquit a defendant if it finds the circumstantial evidence susceptible of two reasonable interpretations, one of which suggests guilt and the other innocence, it is the jury, not the appellate court[,] that must be convinced of the defendant's guilt beyond a reasonable doubt. [Citation.] '"If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment."'" [Citation.]' [Citation.]" (*People v. Virgil* (2011) 51 Cal.4th 1210, 1263.)

"In order to prove a violation of section 422,[6] the prosecution must establish all of the following: (1) that the defendant 'willfully threaten[ed] to commit a crime which will result in death or great bodily injury to another person,' (2) that the defendant made the threat 'with the specific intent that the statement . . . is to be taken as a threat, even if there is no intent of actually carrying it out,' (3) that the threat—which may be 'made verbally, in writing, or by means of an electronic communication device'—was 'on its face and under the circumstances in which it [was] made, . . . so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat,' (4) that the threat actually caused the person threatened 'to be in sustained fear for his or her own safety or for his or her immediate family's safety,' and (5) that the threatened person's fear was 'reasonabl[e]' under the circumstances." (*People v. Toledo* (2001) 26 Cal.4th 221, 227–228.) The determination of whether there is sufficient evidence to support a criminal threats conviction is made by evaluating the totality of the circumstances, including the parties' prior contacts and the manner in which the

---

[6] Section 422 provides: "Any person who willfully threatens to commit a crime which will result in death or great bodily injury to another person, with the specific intent that the statement, made verbally, in writing, or by means of an electronic communication device, is to be taken as a threat, even if there is no intent of actually carrying it out, which, on its face and under the circumstances in which it is made, is so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat, and thereby causes that person reasonably to be in sustained fear for his or her own safety or for his or her immediate family's safety, shall be punished . . . ."

communication was made, to determine whether the communication conveyed to the victim a gravity of purpose and an immediate prospect of execution of the threat. (*In re Ricky T.* (2001) 87 Cal.App.4th 1132, 1137 (*Ricky T.*); *People v. Solis* (2001) 90 Cal.App.4th 1002, 1013 (*Solis*).) In determining whether a criminal threat was made, the jury may consider "all of the circumstances;" "the threatening statement does not have to be the sole cause of the victim's fear." (*Solis*, at p. 1014.)

Officer Kampa testified that Miller threatened several times to kill her and feed her feces. Those threats followed on the heels of a verbal offensive in which Miller loudly and with hostility hurled racist and sexist slurs and profanities. The threats were also made after a comment in which Miller expressed empathy for Christopher Dorner (Dorner), a former police officer who had very recently been on a well-publicized rampage in which he tried to kill law enforcement officers and members of their families, and succeeded in some of his attempts.

Miller does not dispute that the evidence was sufficient to support the first three elements of section 422. He argues only that the prosecution failed to prove that Officer Kampa reasonably was in fear for the requisite sustained period of time. The record reflects that Miller's threats were made after Officer Kampa made a call requesting back-up officers, and that two-to-five minutes elapsed before that back-up assistance arrived and Miller was subdued. Miller argues that Officer Kampa's fear was momentary and fleeting. He also contends there was an insufficient showing that Officer Kampa's fear was reasonable because his angry words were not accompanied by physical violence, there was no contentious history between himself and Officer Kampa, Officer Kampa had no reason to believe he carried a weapon at the time of the threats and she felt no need to use any weapon she carried.

Section 422 does not define "sustained fear." Case law has defined the term to mean "a period of time that extends beyond what is momentary, fleeting, or transitory." (*People v. Allen* (1995) 33 Cal.App.4th 1149, 1156 (*Allen*).) The period need not be lengthy. (*Ibid.* [under the circumstances, 15 minutes of fear was sufficient]; *People v. Fierro* (2010) 180

7

Cal.App.4th 1342, 1348–1349 & fn. 5 (*Fierro*) [sustained fear element satisfied where defendant's threat to kill the victim and display of a weapon lasted just "a minute or so," but victim remained afraid for 15 minutes after reaching a place of safety and calling police]; *Ricky T.*, *supra*, 87 Cal.App.4th at pp. 1139–1140; CALCRIM No. 1300.)

The element of sustained fear also "requires proof of a mental element in the victim." (*Allen*, *supra*, 33 Cal.App.4th at p. 1156.) The threat must "be such as to cause a reasonable person to be in *sustained fear* for his personal safety. . . . The phrase to 'cause[ ] that person reasonably to be in sustained fear for his or her own safety' has a subjective and an objective component. A victim must actually be in sustained fear, and the sustained fear must also be reasonable under the circumstances." (*Ricky T.*, *supra*, 87 Cal.App.4th at pp. 1139–1140.) "Section 422 requires that the communication must be sufficient 'on its face and under the circumstances in which it is made' to constitute a criminal threat." (*In re Ryan D.* (2002) 100 Cal.App.4th 854, 860.) In determining whether a criminal threat has been made the jury should consider "all of the surrounding circumstances" and "the threatening statement does not have to be the sole cause of the victim's fear." (*Solis*, *supra*, 90 Cal.App.4th at p. 1014.)

Neither the statute or case law requires a particular length of time for a finding of sustained fear. A "sustained" period is that "period of time that extends beyond what is momentary, fleeting, or transitory." (*Allen*, *supra*, 33 Cal.App.4th at p. 1156 & fn. 6 ["no minimum time period is required, only a period 'not insubstantial'"]; *Ricky T.*, *supra*, 87 Cal.App.4th at pp. 1139–1140.) Obviously, not every fearful experience satisfies this standard. (*Ricky T.*, at p. 1140 ["Clearly, if any experience of fear constitutes a 'sustained' experience, then the term is superfluous."].) Case law has established parameters.

In *Allen*, *supra*, 33 Cal.App.4th 1149, the court found that "[f]ifteen minutes of fear of a defendant who is armed, mobile, and at large, and who has threatened to kill the victim and her daughter, is more than sufficient to constitute 'sustained' fear for purposes of this element of section 422." (*Id.* at p. 1156.) In *Allen*, the defendant had previously broken into the victim's daughter's home and had repeatedly stalked and assaulted the victim's daughter. (*Id.* at pp. 1151–1152.) The victim had filed police reports on those incidents. (*Id.* at

8

p. 1153.) The defendant, who had a practice of looking inside the victim's home, went by the victim's house several times on the day of the incident at issue. (*Id*. at pp. 1155, 1156.) He approached the victim's back door brandishing a gun and threatened to kill her and her daughter. The victim called the police who arrested the defendant within "'about fifteen minutes or so.'" (*Id*. at p. 1156.) The court found the victim's knowledge of the defendant's prior conduct was relevant to establish a state of sustained fear. (*Ibid*.)

In *Ricky T.*, *supra*, 87 Cal.App.4th 1132, the court applied *Allen*'s definition of sustained fear and found that a teacher's fear was fleeting and insufficient to support a section 422 offense. (*Id*. at p. 1140.) In *Ricky T.*, a high school student left the classroom to use the restroom and found the door locked upon his return. He pounded on the door and as the teacher opened it, the door accidentally hit the student. The student became angry, cursed the teacher and threatened to "get" him (stating "I'm going to kick your ass"), but made no physical movements or gestures. The teacher felt threatened and sent the student to the school office. (*Id*. at pp. 1135–1136.) The court found the teacher's fear insufficient in the absence of evidence showing he felt fear beyond the momentary angry utterances. (*Id*. at p. 1140.) It observed that the police were not called about the incident until the following day, there was no history of disagreements between the student and the teacher, and the threat was not accompanied by a show of force or violence. (*Id*. at pp. 1138, 1140.) Indeed, the student complied with the teacher's demand, left the scene and went to the school office. The court in *Ricky T.* concluded that the student's "statement was an emotional response to an accident rather than a death threat that induced sustained fear." (*Id*. at p. 1141.)

More recently, the appellate court in *Fierro*, *supra*, 180 Cal.App.4th 1342, considered again the sustained fear element. In *Fierro*, the victim and his son had an altercation with the defendant (whom they did not know) at a gas station. (*Id*. at p. 1344.) The defendant drove off, but returned. (*Id*. at p. 1345.) The victim attempted to drive away. Before he was able to leave the defendant confronted him in his car, displayed a weapon in his waistband while yelling obscenities, and threatened to kill the victim and his son. (*Id*. at pp. 1345–1346.) This second encounter lasted about one minute; the threat itself lasted about 40 seconds. (*Id*.

9

at p. 1349 & fn. 5.) When the victim was able to reach a safe place he called the police, still afraid. (*Id*. at p. 1346.)

The court found the evidence supported a finding that the victim experienced sustained fear. (*Fierro*, *supra*, 180 Cal.App.4th at pp. 1348–1349.) The court observed that the victim "testified clearly and more than once that he was horribly scared, and his fright was not fleeting." (*Id*. at p. 1348.) The evidence was sufficient for a finding that "[t]he fear lasted not only through the minute or so that [Fierro] stood there exposing his weapon, but for up to 15 minutes after [the victim] drove away," and "[i]t is entirely reasonable that [the victim] would react as he did for as long as he did." (*Ibid*.) The court explained that, even though the victim was not physically threatened after driving away, the jury could reasonably find that he was still in an emotional state of fear. A "person who hears someone say, 'I will kill you . . . right now,'" coupled with seeing a weapon, is quite justified in remaining 'scared shitless'—as [the victim] put it—for 15 minutes." (*Id*. at p. 1349.) The court further stated that "even if" it accepted appellant's argument that the only relevant time period was while the weapon was displayed, it believed "that the minute during which [the victim] heard the threat and saw appellant's weapon qualifies as 'sustained' under the statute. When one believes he is about to die, a minute is longer than 'momentary, fleeting, or transitory.'" (*Ibid*.)

Miller compares the present circumstances to *Ricky T*., *supra*, 87 Cal.App.4th 1132. He argues that unlike cases such as *Allen*, *supra*, 33 Cal.App.4th 1149 or *Fierro*, *supra*, 180 Cal.App.4th 1342, in which the victim had prior knowledge of the defendant or the defendant's past conduct (albeit brief in *Fierro*), there was no prior interaction or relationship between him and Officer Kampa, he never attempted to follow through with his threat, and Officer Kampa did not testify that she suffered any continuing fear after the back-up officers arrived. Nor, unlike the victim in *Fierro*, did Officer Kampa testify that she believed she was "about to die." Consequently, Miller contends that, like the teacher's fear in *Ricky T*., Officer Kampa's fear was no more than fleeting, and ceased to exist beyond the moments of the encounter. He argues the circumstances of his threats to Officer Kampa, coupled with

10

the brevity of time before the backup officers arrived, demonstrates a lack of substantial evidence supporting a finding that Officer Kampa reasonably suffered more than momentary fear of what was essentially no more than an hyperbolic "emotional response [to receiving a parking citation] rather than a death threat that induced sustained fear." (*Ricky T.*, at p. 1141.) We conclude otherwise.

Section 422 does not require a victim to be so immobilized by fright that he or she is unable to function. The statute requires sustained fear, not paralysis. (§ 422.) The record contains sufficient evidence that Officer Kampa's fear was more than momentary or fleeting. Miller was belligerent and confrontational with Officer Kampa and her partner from the outset. He became combative almost immediately, refused to show his identification, hurled profanity and racial and sexist slurs at the officers as he followed them and his instructor into a classroom. Inside the classroom, Miller continued to refuse Officer Kampa's orders, "maddogging" her, and angrily paced back and forth or adopted a fighting stance with clenched fists then, shortly before he repeatedly threatened to kill Officer Kampa and feed her feces, Miller expressed empathy for Dorner, a man with a vendetta against police officers. Officer Kampa testified she was afraid for her safety. She also feared for others, and so had Miller's instructor leave the room, then locked the door behind him while she waited maintained a significant distance from Miller and summoned backup.

Officer Kampa testified that Miller's demeanor and behavior caused her to be afraid during the duration of her contact with him inside the classroom, which lasted at least a few minutes. This was long enough to surpass a "momentary, fleeting, or transitory" period of time. Further, when considering whether the elements of section 422 are met, we consider the circumstances surrounding the threats, including the manner in which the communication was made. "[A]ll of the circumstances can and should be considered in determining whether a terrorist threat [pursuant to section 422] has been made." (*Solis*, *supra*, 90 Cal.App.4th at p. 1014 [stating that "it is clear a jury can properly consider a later action taken by a defendant in evaluating whether the crime of making a terrorist threat has been committed"].) Miller yelled at Officer Kampa and made unambiguous, unconditional threats to kill her.

11

Officer Kampa took the threats made by a very hostile Miller seriously and was afraid. (See *People v. Martinez* (1997) 53 Cal.App.4th 1212, 1221 [that defendant was "extremely angry," "cursing," and in "very close proximity" to the victim when making the threat could show that he meant serious business when he made the threat].) The circumstances here did not resemble those in *Ricky T.*, *supra*, 87 Cal.App.4th 1132, in which an angry student left and went to the office after being told to do so by a teacher whom he threatened, and in which, "[w]hatever emotion—fear, intimidation, or apprehension—[the teacher] felt during the moment of the verbal encounter, there was nothing to indicate that the fear was more than fleeting or transitory." (*Id.* at p. 1140.)

We also disagree with Miller that the jury could not have found Officer Kampa's fear to be reasonable because, unlike the victim in *Fierro*, *supra*, 180 Cal.App.4th 1342, Officer Kampa had no reason to believe he had access to a weapon and he did not engage in physical violence. A defendant's "mannerisms, affect, and actions" before and after the threat may provide evidence that a victim's fear was reasonable. (*Solis*, *supra*, 90 Cal.App.4th at pp. 1013–1014.) Here, as discussed above, Miller exhibited unreasonably angry, belligerent and combative behavior from the outset of his contact with the officers, reactions vastly out of proportion to the anger one might reasonably expect from someone who received a parking citation. And Miller's behavior only became worse as time progressed, as he began hurling racial, sexist and ethnic slurs, refused to follow the officer's orders, expressed admiration for a murderer and repeatedly threatened Officer Kampa's life. The fact that Officer Kampa had the instructor leave the room, and that she maintained a significant distance from Miller (10 to 15 feet away, in contrast to the typical arm's length) after he threatened her and while waiting for assistance, constitute evidence she was in actual fear. That fear was justified. Miller's anger did not abate and it ultimately took up to seven officers to take him into custody and subdue him as he kicked and struggled. Taken together, Officer Kampa's testimony and Miller's erratic behavior, constitute sufficient evidence to support an inference from which the jury could conclude Officer Kampa was reasonably in sustained fear. (See *Allen*, *supra*, 33 Cal.App.4th at p. 1156 [victim taking

12

immediate steps to protect him or herself, or others, from the threatening individual provides further evidence of actual and reasonable fear, and may show that the fear was more than "momentary, fleeting, or transitory"].)

Miller also misconstrues section 422 when he argues that Officer Kampa's fear was unreasonable because he did not follow up his threats with physical violence. "[S]ection 422 does not require an intent to actually carry out the threatened crime." (*Martinez*, *supra*, 53 Cal.App.4th at p. 1220.) In *Martinez*, an extremely angry defendant cursed at the victim while in very close proximity to the victim when making the threats. (*Ibid.*) The court recognized that "[t]his type of situation can be very intimidating and can carry an aura of serious danger." Similarly, here, Miller's disproportionally hostile reaction to a parking citation and his repeated threats to kill Officer Kampa were "very intimidating" and carried an "aura of serious danger." (*Id.* at p. 1221.) Miller need not carry out the threat, so long as Officer Kampa reasonably feared an assault as the record sufficiently demonstrates she did. A criminal threat is an act of "psychic violence" and "the knowing infliction of mental terror is [as] deserving of moral condemnation" as the infliction of physical injury. (*Solis*, *supra*, 90 Cal.App.4th at p. 1024, italics omitted.) In sum, the record contains sufficient evidence to support Miller's conviction for violation of section 422.

2. *No instruction as to the lesser included offense was required*

Miller argues the trial court committed reversible error by failing to instruct on the lesser included offense of attempted criminal threats, reiterating his contention that substantial evidence of Officer Kampa's sustained fear was simply not present. We are not persuaded.

Whether requested to do so or not, a trial court must "instruct on a lesser included offense . . . if there is substantial evidence the defendant is guilty of the lesser offense, but not the charged offense." (*People v. Moye* (2009) 47 Cal.4th 537, 556; *People v. Breverman* (1998) 19 Cal.4th 142, 177.) There is no duty, however, to instruct on a lesser included offense if there is insufficient evidence that the offense committed was less than that charged. (*Breverman*, at p. 154; *People v. King* (2010) 183 Cal.App.4th 1281, 1319.) A lesser offense

13

is included in a greater offense, triggering the court's instructional duty, when either the statutory elements test or the accusatory pleading test is satisfied. If the statutory elements, or the facts alleged in the accusatory pleading, include all of the elements of the lesser offense, such that the greater offense cannot be committed without committing the lesser offense, the trial court generally must instruct on the lesser offense. (*People v. Smith* (2013) 57 Cal.4th 232, 240.) In assessing a claim of failure to instruct on a lesser included offense, "we review independently the question whether the trial court failed to instruct on a lesser included offense." (*People v. Cole* (2004) 33 Cal.4th 1158, 1215.)

Attempted criminal threat is a lesser included offense of criminal threat. (*People v. Toledo*, *supra*, 26 Cal.4th at pp. 230–231.) In *Toledo*, the Supreme Court explained that a person commits an attempted criminal threat "if a defendant, . . . acting with the requisite intent, makes a sufficient threat that is received and understood by the threatened person, but, for whatever reason, the threat does not *actually* cause the threatened person to be in sustained fear for his or her safety even though, under the circumstances, that person reasonably could have been placed in such fear, the defendant properly may be found to have committed the offense of attempted criminal threat." (*Id.* at p. 231.) Miller contends the evidence that Officer Kampa experienced sustained fear was lacking so the court had a duty to instruct on attempted criminal threat.

As we explained above, Officer Kampa's testimony satisfied the sustained fear element of section 422. Officer Kampa described her intense fear during the threatening episode, fear that continued at least until the back-up officers she summoned arrived to help subdue Miller. Thus, Officer Kampa endured fear of Miller for "a period of time that extend[ed] beyond what is momentary, fleeting, or transitory." (*Allen*, *supra*, 33 Cal.App.4th

14

at p. 1156.)  Evidence as to that element of fear was not sufficiently weak to require the trial court to instruct on attempted criminal threat.

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED.


                                        JOHNSON, J.


We concur:


        CHANEY, Acting P. J.


        MILLER, J.*

---

* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.