Filed 8/28/13  P. v. Taylor CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>KENNETH TAYLOR,<br><br>    Defendant and Appellant. | B241089<br><br>(Los Angeles County<br>Super. Ct. No. YA072658) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Eric C. Taylor, Judge.  Modified and, as modified, affirmed with directions.

Randall Conner, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Kenneth C. Byrne, Supervising Deputy Attorney General, and David F. Glassman, Deputy Attorney General, for Plaintiff and Respondent.

_____

Kenneth Taylor appeals from judgment entered following his conviction by jury of criminal threats (Pen. Code, § 422) with admissions he suffered three prior felony convictions (Pen. Code, § 667, subd. (d)) and three prior serious felony convictions (Pen. Code, § 667, subd. (a)). The court sentenced appellant to prison for six years four months. We modify the judgment and, as modified, affirm it with directions.

## FACTUAL SUMMARY

Viewed in accordance with the usual rules on appeal (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206 (*Ochoa*)), the evidence established that about 1:00 p.m. on July 6, 2008, Carl White, Clyde Clausell, and appellant were at Lennox Park in Los Angeles County. Clausell testified as follows. White, Clausell, and appellant worked for the Department of Parks and Recreation. White, a general maintenance supervisor, was Clausell's supervisor. Clausell was a maintenance supervisor and was appellant's supervisor. White and Clausell were at the park to serve notice on appellant that his employment was being terminated.

White opened the door of the park office and Clausell saw appellant on the phone and sitting at Clausell's desk. Only White, Clausell, and appellant were present. White and Clausell entered the office and appellant hung up the phone. Appellant then said, " 'Oh, I knew this was coming.' "

Clausell stood in the corner of the office. His role was simply to be a witness to the termination. After appellant hung up the phone, White talked with appellant. White took out an envelope containing paperwork and told appellant that his employment was being terminated. Clausell had said nothing to appellant.

Clausell also testified as follows. Once White mentioned termination, appellant "lost it." Appellant was yelling and screaming, saying it was everybody's fault and saying it was all Clausell's fault. Appellant became belligerent and said Clausell "didn't stand up for [appellant] and stand behind [appellant's] back while other people was all in [appellant's] business." Appellant continued talking and said to Clausell, " 'You not a man. You a bitch and you a faggot. Your wife, . . . wear the pants and you ain't nothing

but a punk.' " Appellant then said, " 'Yeah, but you getting a pass today.' " Appellant was trying to provoke Clausell.

Appellant was sitting in the office chair perhaps four feet from Clausell, and Clausell was standing in the doorway. The office was very small, about eight feet by ten feet. When appellant was calling Clausell a punk, bitch, and similar words, appellant's demeanor was like that of a mad man.

Appellant took keys off a ring and threw them on the desk. Although Clausell had not said anything to appellant, appellant began coming at Clausell. Clausell testified "[appellant] took [his personal keys] and put them in between his hand and he started lunging at me talking about 'Come on, mother fucker. You want some of this? You want some of this?' " Appellant also used a racial epithet towards Clausell. Clausell could see one key protruding from between appellant's index finger and his ring finger. Appellant lunged at Clausell perhaps four or five times with the key in his hand. Clausell also testified appellant was standing but using his upper body "as if . . . swinging his fists around saying, 'Come on.' " When appellant lunged at Clausell, appellant's hand came within perhaps six or eight inches of Clausell. When Clausell demonstrated this at trial, Clausell held his hand in front of his chest. When appellant's hand came to within about six to eight inches of Clausell, Clausell stepped back. White intervened and appellant stopped lunging at Clausell.

Clausell testified, "[Appellant] said, 'You ain't nothing but a Mexican lover and I hope the sons of bitches chop you up into pieces.' And then after he said that, then he turned around and he said, 'Yeah.' He said, '*Next time they see you, you going to be like this in a mother fucking coffin and I don't care, I'm going to get even with all of you all.*' " (Italics added.) *When appellant said that, appellant crossed appellant's wrists in front of appellant*. The prosecutor asked Clausell, "What did you take that statement to mean, . . . the statement where the defendant showed you his wrists crossed over each other?" Clausell replied, "*To me that's a death threat*" (italics added) because people who died were placed in coffins with their hands crossed.

3

The prosecutor asked Clausell if he remembered how far appellant was from Clausell when "[appellant] made the gesture with his wrists crossed and told you he would put your hands like that in a coffin." Clausell replied appellant was about a foot away. Clausell felt "real terrible" at the time of the confrontation. The prosecutor asked if Clausell was scared, and Clausell replied, "Scared. I wasn't more just like scared, but I wasn't going to let no harm to me come." (*Sic.*) Clausell thought appellant was able to carry out the threat against Clausell. The prosecutor asked if Clausell thought appellant would carry out the threat against Clausell, and Clausell replied, "Sooner or later." Appellant said only once that he "was going to arrange [Clausell's] wrists in a coffin." That was the last time Clausell saw appellant. Appellant never touched Clausell while White, Clausell, and appellant were in the office. Clausell did not consider calling the police while he was at the office.

The prosecutor asked Clausell if he ever threatened appellant. Clausell replied that he only asked appellant if appellant was through now, appellant looked at Clausell, and Clausell told appellant not to call Clausell's house or cell phone in the future. Clausell also indicated his attorney would be contacting appellant. Clausell never made physical movements towards appellant.

Clausell also testified as follows. After appellant made the statement about the coffin, White gave Clausell papers to copy, and Clausell went to the front office to copy them. The front office was about 40 feet away. The copy machine was broken so Clausell immediately returned. The prosecutor asked if Clausell expected appellant to do anything to Clausell when Clausell returned. Clausell replied, "I didn't know what he was capable of at the ration [*sic*] he was in." Appellant's counsel asked if Clausell was afraid to return to the office, and Clausell replied, "And I came back. I knew I had to come back so . . . ." When Clausell returned, appellant was gone.

After appellant left, Clausell put away tools that appellant had left out, locked up the facility, then drove to the county police department. Clausell went there because appellant had threatened Clausell's life and appellant had told Clausell that appellant was

4

going to hurt Clausell, his family, and whoever was around Clausell. Clausell told an officer what had happened.

Clausell testified the incident affected his employment. Clausell had to leave work for about a month because of stress and anxiety attacks, and his blood pressure went up. The incident was debilitating and prevented him from progressing in his career. Clausell saw three psychologists and was seeing someone at time of trial. Because of the incident, Clausell had to take medications to "keep [him] from snapping." Clausell also testified he was having anxiety attacks "Because my life had been threatened and my fiancée and . . . nobody had threatened me like that before . . . ." The prosecutor then asked Clausell, "Were you scared?" and Clausell replied, "I flipped into another zone. Yeah." Clausell did not know what was going to happen. He was watching his back and was paranoid.

Clausell no longer worked at the park. The department transferred him at his request because the situation was too dangerous. After appellant made the threat against Clausell, Clausell received phone calls at home. A person(s) would call Clausell's home or cell phone but say nothing. The calls stopped after Clausell spoke with a county police officer. Clausell denied he heard appellant's voice during the calls made to his home. Clausell had been in a relationship with someone but at time of trial he had been separated for a year because "of all these threats and me going through stress and everything dealing with this case and losing our park . . . ." Clausell denied he was afraid of appellant at time of trial and testified "I put it in the Lord's hands."

White testified as follows. White told appellant his service was no longer needed because he was having too many issues. When White told appellant why White was there, appellant was very upset, jumped up, and confronted Clausell. Appellant was face to face with Clausell. Appellant was lunging towards Clausell while appellant was talking. At one point White told appellant, " 'Hold on, calm down now,' " but that was ineffective and White thought an altercation might occur. White thought appellant lunged at Clausell five or six times while appellant was talking. White testified appellant

5

"wrapped it up with saying 'I'll see you like this' " while appellant crossed his wrists in front of him. Appellant was very angry and using profanity.

The prosecutor asked White whether he believed appellant meant what he was saying when appellant, with his wrists crossed, said to Clausell, " 'Next time I see you . . . I'll see you like this.' " White replied, "[appellant] looked serious to me." White testified that appellant did not tell Clausell that appellant was going to hurt Clausell, but "[appellant's] tone, his body language all spoke on hurt." (*Sic*.) Clausell was not doing anything but facing appellant. Clausell looked scared.

White also testified as follows. White asked for the keys again and appellant threw them on the floor. Appellant had one key sticking out between the two middle fingers of his right hand. White asked for the keys once more and appellant tossed them and stormed out. After appellant made the threats, Clausell, on his own and without instruction from White, went and filed a report. About a minute passed from the time appellant left the park to the time Clausell went to the police department.

During cross-examination, White testified as follows. After White entered the office and saw appellant, White and Clausell remained in the office. Clausell did not immediately leave after appellant said, "The next time I see you, you'll be like this" and crossed his hands. Appellant was the first to leave. When appellant walked by Clausell, Clausell was standing at the doorway and appellant did not touch him. Clausell left after appellant left.

Los Angeles County Police Officer Gerardo Cedano testified as follows. On July 6, 2008, about 1:00 p.m. or shortly thereafter, Clausell contacted Cedano and told Cedano that Clausell had just been threatened by appellant. Clausell appeared to be afraid. During direct examination, Cedano testified Clausell told him the following. Appellant had verbally threatened Clausell and it appeared appellant was going to hit Clausell with a set of keys. Appellant said that he was going to put Clausell's hands in a casket. That meant appellant was going to kill Clausell. Clausell believed that appellant would hurt him and that appellant knew where Clausell lived. Appellant presented no defense evidence.

6

Appellant claims (1) there is insufficient evidence to support his conviction, and (2) the trial court erred by imposing a $40 Penal Code section 1465.8 court security fee.

*DISCUSSION*

1. *Sufficient Evidence Supports Appellant's Conviction.*

    a. *Pertinent Facts.*

On February 2, 2010, after the People rested, appellant moved for a judgment of acquittal pursuant to Penal Code section 1118.1. Appellant argued that what Clausell testified appellant said to him was not "unequivocal, unconditional, immediate and specific as to convey a gravity of purpose and immediate prospect of execution" for purposes of Penal Code section 422. After further discussion by the court and parties, the court continued the hearing on the motion to February 3, 2010, to permit the court to consider the issue.

On February 3, 2010, the court said Clausell testified that appellant stated, " 'Next time they see you, you're going to be like in a mother fucking coffin and I don't care. I'm going to get even with all of you.' " The court stated, "Those are the words indicating a threat or that you argued was a threat." The court indicated the issue was whether that statement was sufficient evidence as against a motion for a judgment of acquittal. The court acknowledged it could not discount appellant's statement " 'Your hands are going to be crossed like this.' " After further discussion by the court and parties, the court denied appellant's motion.

    b. *Analysis.*

Appellant claims the trial court erred by denying his Penal Code section 1118.1 motion and claims there was insufficient evidence to support his conviction. Since appellant presented no defense evidence, the applicable test is the same as to each claim, i.e., whether, based on the People's evidence, there was sufficient evidence to convince a rational trier of fact, beyond a reasonable doubt, that appellant committed the charged offense. (*People v. Cole* (2004) 33 Cal.4th 1158, 1212-1213.)

In *People v. Toledo* (2001) 26 Cal.4th 221 (*Toledo*), our Supreme Court stated, "In order to prove a violation of [Penal Code] section 422, the prosecution must establish all of the following: (1) that the defendant 'willfully threaten[ed] to commit a crime which will result in death or great bodily injury to another person,' (2) that the defendant made the threat 'with the specific intent that the statement . . . is to be taken as a threat, even if there is no intent of actually carrying it out,' (3) that the threat -- which may be 'made verbally, in writing, or by means of an electronic communication device' -- was 'on its face and under the circumstances in which it [was] made, . . . *so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat*,' (4) that the threat actually caused the person threatened 'to be in sustained fear for his or her own safety or for his or her immediate family's safety,' and (5) that the threatened person's fear was 'reasonabl[e]' under the circumstances. [Citation.]" (*Id.* at pp. 227-228, italics added.)

As the court observed in the case of *In re Ryan D.* (2002) 100 Cal.App.4th 854, "the statute 'was not enacted to punish emotional outbursts, it targets only those who try to instill fear in others.' [Citation.] In other words, [Penal Code] section 422 does not punish such things as 'mere angry utterances or ranting soliloquies, however violent.' [Citation.]" (*Id.* at p. 861.)

Moreover, "the determination whether . . . the words were sufficiently unequivocal, unconditional, immediate and specific [that] they conveyed to the victim an immediacy of purpose and immediate prospect of execution of the threat can be based on all the surrounding circumstances and not just on the words alone. The parties' history can also be considered as one of the relevant circumstances." (*People v. Mendoza* (1997) 59 Cal.App.4th 1333, 1340.) The surrounding circumstances include "the defendant's mannerisms, affect, and actions involved in making the threat as well as subsequent actions taken by the defendant." (*People v. Solis* (2001) 90 Cal.App.4th 1002, 1013.)

8

Appellant argues his "words and mannerisms conveyed an emotional outburst in response to getting fired from his job, and did not convey a gravity of purpose and an immediate prospect of execution." That is, appellant's sufficiency claim pertains only to the third enumerated element in *Toledo*.[1] We reject appellant's claim.

We have set forth the pertinent facts. They include Clausell's testimony which, fairly read, reflects that (1) appellant said to Clausell ". . . 'Next time they see *you, you* going to be *like this* in a mother fucking coffin and I don't care, *I'm going to get even with all of you all*' " (italics added) and (2) when appellant said this, appellant crossed appellant's wrists in front of appellant. Clausell testified he took this to be a death threat because people who died were placed in coffins with their hands crossed.

We conclude, based on all of the evidence, that there was sufficient evidence to convince a rational trier of fact, beyond a reasonable doubt, that appellant committed a violation of Penal Code section 422, including sufficient evidence that appellant's threat was on its face and under the circumstances in which it was made so unequivocal, unconditional, immediate, and specific as to convey to Clausell a gravity of purpose and an immediate prospect of execution of the threat. (*People v. Ochoa, supra*, 6 Cal.4th at p. 1206.) None of the cases cited by appellant compels a contrary conclusion. This includes *In re Ricky T.* (2001) 87 Cal.App.4th 1132, which is distinguishable from the present case.[2]

---

[1]     Appellant, in his opening brief, comments in passing, "The fact that supervisor White had instructed Clausell to accompany him as a 'witness' to the firing of appellant indicates that both White and Clausell had anticipated appellant's angry response. This calls into question the jury's conclusion that Clausell's fear was reasonable under the circumstances." (See fn. 2, *post*.)

[2]     To the extent appellant claims there was insufficient evidence that Clausell's fear was reasonable under the circumstances (see fn. 1, *ante*), we reject that claim as well.

2.  *The Trial Court Erred by Imposing a $40 Penal Code Section 1465.8, Subdivision (a)(1) Court Security Fee.*

The trial court imposed a $40 Penal Code section 1465.8, subdivision (a)(1) court security fee.  Appellant claims the fee should have been $30, not $40, because, at the time of the conviction in this case (i.e., in 2010), the fee was $30 per conviction.  Respondent concedes the issue.  We accept the concession (cf. *People v. Davis* (2010) 185 Cal.App.4th 998, 1000-1001) and we will modify the judgment accordingly.

### DISPOSITION

The judgment is modified by reducing the Penal Code section 1465.8, subdivision (a)(1) court security fee, previously imposed by the trial court, from $40 to $30 and, as modified, the judgment is affirmed.  The trial court is directed to forward to the Department of Corrections an abstract of judgment reflecting the above modification.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

KITCHING, J.

We concur:

KLEIN, P. J.

CROSKEY, J.

10