Filed 3/24/14  P. v. Gasway CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

| | |
|---|---|
| THE PEOPLE, | C074765 |
| Plaintiff and Respondent, | (Super. Ct. No. 13F02421) |
| v. | |
| ANDREW JAMES GASWAY, | |
| Defendant and Appellant. | |

A jury convicted defendant Andrew James Gasway of criminal threats (Pen. Code, § 422)[1] and corporal injury to a cohabitant (§ 273.5, subd. (a)).  Defendant admitted two prior prison term allegations (§ 667.5, subd. (b)) and the trial court sentenced him to five years eight months in state prison.

The sole issue on appeal is whether the trial court erred in failing to stay the sentence for the criminal threats count pursuant to section 654.  We affirm.

---

[1] Undesignated statutory references are to the Penal Code.

1

FACTS

Yasmea West was 20 years old at the time of the trial.[2]  She knew defendant for many years, and started dating him in January 2013.  Her nickname for him was A. J.  West moved into an apartment near her mother's house in late March or early April 2013.  Defendant lived with her but did not sign the rental agreement.

West testified that on April 16, 2013, defendant came into the kitchen while she was making dinner and asked her to make some Thai food.  West told defendant she was making something else; defendant walked away, making "little comments under his breath that pretty much he was going to go eat at another female's house."  According to West, she told defendant that he could take his belongings "while he's at it."  Defendant and West then began to curse at each other.

As the argument continued, West started putting defendant's clothes inside his suitcase.  Defendant took West's cell phones from a counter and put them in his pocket.  West told defendant not to take the phones, which initiated an argument about the phones.  West tried to grab the phones but defendant prevented her, which led her to swear at him and resume packing his belongings.

Defendant followed West into the bedroom, saying he did not have to go.  West told defendant she would call the police if he did not leave.  When she turned to the front door, defendant stopped West by grabbing her upper arms, which hurt her.  Defendant turned away and West hit him in the head.  She and defendant "start[ed] going at it."  West soon had an asthma attack; defendant grabbed her inhaler and West ran out of the apartment to get air.

West went out of the apartment and walked downstairs; defendant rushed down the stairs to give her the inhaler and grabbed West's back.  West refused the inhaler and

---

[2]  West was in custody for failure to appear and under a grant of immunity when she testified.  She also testified that she still loved defendant.

walked downstairs to a neighbor's apartment, where she told the neighbor she could not breathe and needed to use the phone. West called 911 and told the operator she wanted defendant escorted out of her apartment. She told the operator that she got into an argument with her boyfriend and he would not leave her home. The 911 operator asked if she needed an ambulance, and West said she did not.

West testified that she sustained bruises on her arm and a scratch on her neck as a result of being held by defendant.

West walked to her mother's house, where she was met by two sheriff's deputies. According to West, she told the deputies "pretty much what had happened." However, she did not tell the truth when she told the deputies that defendant hit her while she was in the fetal position. The deputies asked what she wanted; West replied she wanted defendant to take his belongings and leave.

When the deputies left, West went to Wal-Mart and bought new locks for her apartment. She got a phone call from defendant, who told her they needed to talk. When West told defendant she was going to change the locks, defendant threatened to "mess up" the apartment if she did.

Defendant was not present when West returned to her apartment. Her mother's boyfriend, Willie Harris, helped West change the locks. At one point, West went to the bathroom. When she returned, West saw defendant approaching. Defendant said he wanted his stuff; West went to the closet, and packed defendant's clothes into a suitcase, which she brought to the front door.

West then waited while defendant gathered his belongings. According to West, she cursed at defendant and called him names because she was still angry about the "whole situation." Defendant eventually picked up a knife and sliced the couch. He then broke several other knives. When West asked what he was doing, defendant replied they were his couches so he could do with them as he pleased. Defendant was arrested by the police a short while later.

3

Barbara Donnelly managed the apartment complex where West lived. On the evening of April 16, 2013, she saw West talking to another woman. Seeing that West was "crying and shaking," Donnelly asked why she was upset. West said she had to leave her apartment because her boyfriend was threatening her and she had dropped her keys as she fled.

Portions of West's 911 call were played to the jury. West told the operator that she needed the police to help remove someone from her home. Defendant had spent the night; he got into an argument with her, hit her, put her in a choke hold, and took her cell phone.

Harris testified that he went to West's apartment one night in April 2013 to help change the locks. Defendant was not there when they arrived, but came later to get his "clothes and stuff." He did not see defendant threaten West.

Sacramento County Sheriff's Deputy Catherine Muller was dispatched to West's apartment complex at around 8:00 p.m. on April 16, 2013, in regard to someone refusing to leave an apartment. She was subsequently redirected to West's mother's house, where she met West. West was "relatively calm." She told the deputy that she and "A. J. were in an argument which escalated." The argument started when she asked some of his friends to leave and he got upset. A. J. called her a bitch, when she called him a bitch in return, he punched her.

West told Deputy Muller that A. J. grabbed her with both hands as he faced her. He "encircled her neck with his arm and was choking her." West had trouble breathing, so she freed herself by pulling his hair. She walked towards the bedroom; A. J. followed and punched her again. He then pushed West onto a mattress and leaned over her. West "balled up" on the mattress as A. J. kept hitting her and calling her names. When A. J. went to the bathroom, she left the apartment and went to a neighbor, where she called 911. West did not want to press charges; she just wanted him to leave.

4

As she interviewed West, Deputy Muller saw defendant come out of the backyard through the side gate. Defendant looked at them, turned around, and walked towards the side gate and backyard. Deputy Muller's partner went into the backyard to investigate, but defendant was gone. Deputy Muller spent some time looking for defendant and then cleared the call.

At 9:51 p.m., West called to report "A. J." was on the way to her apartment, where he would "be messing things up." Deputy Muller was dispatched; West was not there when she arrived at the apartment. She drove to West's mother's house, where West gave her a key to the apartment. Deputy Muller went back and entered the unoccupied apartment. Harris and West arrived a few minutes later. West said she was going to change the locks on the apartment, so Deputy Muller cleared the call at 10:40 p.m.

Deputy Muller returned to West's apartment at 11:09 p.m. Watching from her patrol car, Deputy Muller saw West and Harris walking towards Harris's car, where defendant was sitting in the back seat. Her partner handcuffed defendant and Deputy Muller contacted West.

Deputy Muller entered the apartment, where she saw that the previously undamaged couches now were sliced and had "knife pokes." The couches had been sliced between 10 and 20 times. There were also several broken knives in a garbage can.

West told Deputy Muller that defendant had come back to the apartment after the deputies left the second time. When defendant arrived, West went to the bedroom to get his things. Upon leaving the bedroom, West saw defendant taking knives out of the block, breaking the blades, and throwing them away. He then walked to the couches and sliced and stabbed them. West walked to the front door, where Harris was working on the locks. Defendant told West to lower her voice as she was putting herself in danger. He told her that he would "cut her." West told Deputy Muller she was afraid that

5

defendant would stab her and thought he would kill her.[3]  West said she wanted to press charges against defendant and would testify against him in court.

Harris told Deputy Muller that defendant "threatened to stab" West with a knife. He did not intervene when defendant was cutting the couches because he thought defendant might have a gun.

The parties stipulated that Harris testified at the preliminary hearing that he saw defendant cut the couches with a knife, but never heard him threaten West.

DISCUSSION

Defendant contends the trial court erred in failing to stay sentence on the criminal threats count pursuant to section 654.  He claims that the beating in the first encounter and the threat in the final encounter between West and defendant was part of a "continuous running argument, with outbreaks of violence and invective."  According to defendant, he "had a single intent throughout the argument -- to force West to submit to his terms for the relationship."

In relevant part, section 654 provides:  "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision."  (§ 654, subd. (a).)

"[I]t is well settled that section 654 applies not only where there was but one act in the ordinary sense, but also where there was a course of conduct which violated more than one statute but nevertheless constituted an indivisible transaction.  [Citation.] Whether a course of conduct is indivisible depends upon the intent and objective of the actor.  If all the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one.  [Citation.]"  (*People v. Perez*

---

[3]  Testifying, West denied relating these threats to Deputy Muller and claimed that she did not feel threatened by him.

(1979) 23 Cal.3d 545, 551.) "It is defendant's intent and objective, not the temporal proximity of his offenses, which determine whether the transaction is indivisible. [Citations.]" (*People v. Harrison* (1989) 48 Cal.3d 321, 335.) "A trial court's implied finding that a defendant harbored a separate intent and objective for each offense will be upheld on appeal if it is supported by substantial evidence. [Citation.]" (*People v. Blake* (1998) 68 Cal.App.4th 509, 512.)

Defendant assaulted West in the first incident, which took place before Deputy Muller was dispatched at 8:00 p.m. According to West's statement to Deputy Muller, this happened during an argument with defendant that escalated to domestic violence. The argument started when West told defendant's friends to leave. The criminal threats count took place during the last encounter, between 9:51 p.m., Deputy Muller's second dispatch to West's apartment, and her third dispatch there at 11:09 p.m. This took place while West was changing the locks to the apartment she had shared with defendant. According to West's testimony, when defendant called her after the first incident, he threatened to mess up the apartment if she changed the locks. Thus, both counts took place at separate times, were motivated by separate events, and defendant had time to reflect in between them.

Separate acts of violence against the same victim, with time for reflection in between, can be punished separately without trenching on the text or spirit of section 654, because the actor in such cases merits greater punishment. (See *People v. Solis* (2001) 90 Cal.App.4th 1002, 1022 [defendant left threatening messages, then burned apartment after victims fled, multiple punishment for arson and threats upheld]; *People v. Surdi* (1995) 35 Cal.App.4th 685, 688-690 [offenses "separated by considerable periods of time during which reflection was possible"]; *People v. Trotter* (1992) 7 Cal.App.4th 363, 368 [defendant should " 'not be rewarded where, instead of taking advantage of an opportunity to walk away from the victim, he voluntarily resumed his . . . assaultive behavior' "].)

Taking a global view, defendant's goal may have been to force West to submit to their relationship on his terms.  But the trial court could find that in aid of that goal, he committed separate acts each meriting punishment.  For example, in *People v. Felix* (2001) 92 Cal.App.4th 905, the court upheld separate punishment for two threats made on the same day, observing:  "Felix contends these crimes were part of a pattern of anger against Luckhart.  But Felix had time to reflect before making the second threat.  The trial court could reasonably infer that because of his anger he intended the second threat to cause new emotional harm to Luckhart." (*Id.* at pp. 915-916.)  So, too, here.

DISPOSITION

The judgment is affirmed.


                                                   BLEASE           , Acting P. J.


We concur:


      MURRAY         , J.


      DUARTE         , J.