Filed 4/12/21  P. v. MacKay CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E074154 |
| v. | (Super.Ct.No. INF1900720) |
| JAMES MACKAY, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  James T. Latting, Judge. Affirmed as modified.

Gregory L. Cannon, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Robin Urbanski and Genevieve Herbert, Deputy Attorneys General, for Plaintiff and Respondent.

1

A jury found defendant and appellant James MacKay guilty of making criminal threats. (Pen. Code,[1] § 422, count 1.) A trial court granted probation for a period of three years under specified conditions.

On appeal, defendant contends there was insufficient evidence to support his conviction. In supplemental briefing, he further contends that Assembly Bill No. 1950 (Reg. Sess. 2019-2020), which amended section 1203.1 to limit the probation term for most felony offenses to two years, applies retroactively to this case. (Stats. 2020, ch. 328, § 2.) The People concede, and we agree, that the amended statute applies. In all other respects, we affirm the judgment.

## FACTUAL BACKGROUND

In early April 2019, C.M. (the victim) hired defendant to install a swamp cooler in his house. Defendant assured the victim that the work would be done in a timely manner, so the victim paid him $1,200 up front for the labor. They agreed defendant would charge the victim for the materials and the actual unit after the job was completed.

Defendant worked irregular hours on the job, and he promised the job would be done by a certain time, but that time came and went. He then broke the main water line and left the victim with a flooded front yard. Because of all the problems, the victim tried to rescind his contract with defendant by sending him an e-mail on April 21, 2019. The victim said he was rescinding the contract because he did not see the work getting

---

[1] All further statutory references will be to the Penal Code unless otherwise indicated.

done, and he had to hire a plumber to fix the water line. He also told defendant he wanted him to return $800 in cash.

Defendant replied to the e-mail that night and stated he was going to sue the victim in small claims court. In his next e-mail, defendant said, "Also, favors in dhs [Desert Hot Springs] are bought rather cheap. Good luck." The victim took that comment as a threat that defendant was going to have somebody "rough [him] up or worse." The victim responded by saying he would notify the proper authorities immediately since defendant was apparently threatening him. The victim also asked for the $800 again. Defendant responded by saying, "Look punk you can notify anybody you wish. Punk a-- bitch." He also said, "Your karma is coming around," and "You owe me and mother f---er I will get mine." The victim took all these comments as threats to him and his family since defendant knew where he lived and had been to his home.

Defendant sent another e-mail to the victim that night, saying, "You are so lucky that you didn't get the boots put to you yesterday. It's still not too late." The victim responded with, "That's a criminal threat." Defendant then replied, "You have got to be the only people in the valley that woke up today and thought it was a wise idea to screw with [me]. . . ." Defendant's next e-mails said, "You go and press charges then. Boots are not a threat." "More like a promise with soul." Defendant and the victim kept e-mailing back and forth, disputing the money owed. Finally, the victim sent an e-mail telling defendant he did not want to continue arguing, and defendant would need to file a small claim if he believed the victim owed him money. He added that if defendant was not going to refund him the $800, they could let a judge decide. Defendant's e-mails in

3

response stated, "Street court justice," "After hours bill collection ltd.  North valley tax collection," and "Rocco, moose, help the council[2] [*sic*] find his cheekbook [*sic*]."  The victim understood these statements to mean that defendant would hire somebody, or he would personally come and "rough [him] up" and that would be the justice he deserved for not paying defendant.

That same night, defendant and the victim continued their conversation through text messages.  The victim told defendant he had lost $1,200, plus costs for the plumber, and asked if defendant was going to pay for the plumber.  Defendant said, "You have no idea about what this will wind up costing," "I mean that should strange things start to occur, costly things."  The victim understood that text as a threat that defendant would either cause him physical harm or cause damage to his home, or both.  He sent a text in reply, saying, "If they occur jail is not a great place."  Defendant responded, "Look I do not have a problem in county jail."  In another text, he said, "You are thinking you can run roughshot [*sic*] over me and just burn me for $670."  He also said, "I am going to do what I have to do for my money from you."  After a few more text exchanges, defendant texted, "Enough said.  Time for the diabolical side to rear its ugly mug."

The next day, defendant sent the victim a text stating, "I have nothing to loose [*sic*] at this point.  I am hoping to resolve this professionally.  The otherside of coin [*sic*] is you have to be on alert.  Always wondering who is next to you at the store.  Or gas

---

2  The victim is an attorney.

4

station. . . ." The victim felt that defendant was attempting to create a sense of fear in him by making him wonder if someone would assault him if he went anywhere.

Defendant also sent the victim an e-mail that day, stating, "Look bitch I am going to blacken [both] of yours man to man. Tell whom ever you want simple battery is no big crime and believe me your a-- is getting jumped but not by me but a friend. I hate to be un [*sic*] your loafers." The victim responded by telling defendant to expect a visit from the police, since he would be turning these messages over and filing a report. Defendant replied, "Look . . . I do not give a f---. Your a-- is grass." He followed up with more e-mails stating, "You are f---ing with the wrong people," "The police can kiss my a--," and "I will proudly do 30 or 90 days. Let's see how you like going to work looking like a beat wife." The victim understood defendant's statements to mean that he was going to make good on his threat and that he would either have someone assault him physically or do it himself. The victim was a single parent with a little boy, and defendant knew where he lived. The victim became very concerned for his and his child's safety. The victim took defendant's threats of bodily harm seriously, because he did not know defendant personally and because of the number of times he threatened him.

Shortly after receiving defendant's e-mails, the victim went to the police station and told an officer he feared for his safety due to defendant's e-mails and texts. The officer called defendant to try and help mediate the situation. He told defendant he could go and pick up the tools he left at the victim's house that day, and that he would be present. Defendant said he would pick up his tools at his convenience, not the victim's

convenience, and that he is "calling the shots," not the victim. Defendant also said the following: "I'll tell you that to a man right now, man-to-man, no problem. I, I'll beat his a-- to a pulp and I'll go to jail for it. That's fine but that's gonna be his payback 'cause I'm from Desert Hot Springs and I don't know where he's from but he doesn't treat people like that." In a subsequent phone call, the officer told defendant he was trying to prevent someone from going to jail. Defendant responded, "I'm trying to prevent somebody from getting their eyes blackened and somebody going to jail. So we're on the same page here sir. So if you could convey that to [the victim]. . . . Tell him . . . I don't know why you want this guy to do all this work and then not pay 'em when he's almost done . . . that's pretty underhanded . . . let the chips fall where they may. . . . I'm a man. I'll man up. I'll take my punishment what – but he's gonna get his. I'm gonna get mine . . . that's the way justice works these days, especially in the wild west of DHS. [¶] . . . [¶] You can tell him what I'm sayin' and you can tell him that . . . you playing with fire, fire, okay? Fire. Bye."

DISCUSSION

## I. The Evidence Was Sufficient to Support Defendant's Conviction

Defendant argues the evidence was insufficient to support his criminal threats conviction, claiming that he did not threaten to commit a crime that would result in death or great bodily harm, and the victim did not perceive that he threatened death or great bodily injury. He characterizes the circumstances simply as "a contract dispute [that] devolved into threats," and argues that section 422 "is not violated by schoolyard threats." We conclude the evidence was sufficient.

6

A. *Standard of Review*

"To assess the evidence's sufficiency, we review the whole record to determine whether *any* rational trier of fact could have found the essential elements of the crime or special circumstances beyond a reasonable doubt. [Citation.] The record must disclose substantial evidence to support the verdict—i.e., evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] In applying this test, we review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence. [Citation.] 'Conflicts and even testimony [that] is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. [Citation.] We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence. [Citation.]' [Citation.] A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support" ' the jury's verdict." (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.)

B. *The Evidence Was Sufficient*

The jury was instructed that, in order to find defendant guilty of having made a criminal threat, the People had to prove the following elements:

"1. The defendant willfully threatened to unlawfully kill or unlawfully cause great bodily injury to [the victim];

7

"2. The defendant made the threat by electronic communication device;

"3. The defendant intended that his statement be understood as a threat;

"4. The threat was so clear, immediate, unconditional, and specific that it communicated to [the victim] a serious intention and the immediate prospect that the threat would be carried out;

"5. The threat actually caused [the victim] to be in sustained fear for his own safety or for the safety of his immediate family;  [¶]  AND  [¶]

"6. [The victim's] fear was reasonable under the circumstances."  (See *People v. Solis* (2001) 90 Cal.App.4th 1002, 1013 (*Solis*).)  Defendant appears to be challenging the sufficiency of the evidence as to the first, fourth, and fifth elements.

The evidence showed that defendant threatened to beat up the victim, and the jury could reasonably conclude that the beating would result in great bodily injury.  The phrase "great bodily injury" in section 422 has been interpreted to mean " 'a significant or substantial physical injury.' "  (*People v. Maciel* (2003) 113 Cal.App.4th 679, 686, citing § 12022.7, subd. (f).)  "[S]ome physical pain or damage, such as lacerations, bruises, or abrasions is sufficient for a finding of 'great bodily injury.' "  (*People v. Washington* (2012) 210 Cal.App.4th 1042, 1047.)  In one text, defendant said, "Look bitch I am going to blacken [both] of yours man to man . . .  and believe me your a-- is getting jumped."  When the victim said he was going to report defendant to the police, defendant replied, "I do not give a f---.  Your a-- is grass."  He followed up with an e-mail saying, "Let's see how you like going to work looking like a beat wife."  These

8

words convey a threat of great bodily injury, as defendant was apparently threatening to beat the victim up and, at minimum, give him two black eyes.

Furthermore, courts have held that "all of the surrounding circumstances should be taken into account to determine if a threat falls within the proscription of section 422." (*Solis*, *supra*, 90 Cal.App.4th at p. 1013.) The circumstances here communicated to the victim that defendant was going to assault him and leave him with physical injuries, and the evidence shows that the victim understood his words to be such threats. It also shows the victim feared for his safety and the safety of his child. Defendant warned that he was "going to do what I have to do for my money from you." He threatened the victim with "street court justice," said it was "[t]ime for the diabolical side to rear its ugly mug," and told the victim he did not have a problem with going to county jail. He followed up with more e-mails stating, "You are f---ing with the wrong people," "The police can kiss my a--," and "I will proudly do 30 or 90 days." The victim testified that he understood defendant's words to mean that defendant would beat him up for not paying him or hire somebody to beat him up. The victim became very concerned for his family's safety since he was a single parent with a little boy, and defendant knew where he lived. He took defendant's threats of bodily harm seriously because he did not know defendant personally and because of the number of times he threatened him.

Viewing the evidence in the light most favorable to the judgment, we conclude that a reasonable trier of fact could have easily inferred from the circumstances that defendant's words conveyed a threat of great bodily harm. Moreover, the victim

9

understood his words to be threats within the meaning of section 422. Thus, the evidence was sufficient to support defendant's conviction.

## II. Defendant's Probation Term Should Be Reduced

Defendant argues his probation term should be reduced because section 1203.1, subdivision (a), under which he was sentenced to three years formal probation, has been amended by Assembly Bill No. 1950 effective January 1, 2021. He contends that because his case is not yet final, under the principles of retroactivity applicable to ameliorative changes to the criminal law as set forth in *In re Estrada* (1965) 63 Cal.2d 740 (*Estrada*), he is entitled under Assembly Bill No. 1950 to have his probation term reduced from three years to two years. The People concede, and we agree.

When defendant was sentenced, section 1203.1 provided that a trial court may grant felony probation "for a period of time not exceeding the maximum possible term of the sentence." If the "maximum possible term of the sentence is five years or less, then the period of suspension of imposition or execution of sentence may, in the discretion of the court, continue for not over five years." (Former § 1203.1, subd. (a).) The trial court here granted probation for three years.

Effective January 1, 2021, Assembly Bill No. 1950 amended section 1203.1, subdivision (a), to limit the probation term for felony offenses to two years, except in cases of certain violent felonies. (Stats. 2020, ch. 328, § 2; § 1203.1, subds. (a), (m).)

Based on the recent opinion in *People v. Sims* (2021) 59 Cal.App.5th 943 (*Sims*), we conclude the parties are correct regarding the retroactivity of Assembly Bill No. 1950. As the court stated in that case, "the two-year limitation on felony probation set forth in

10

Assembly Bill No. 1950 is an ameliorative change to the criminal law that is subject to the *Estrada* presumption of retroactivity. . . . Therefore . . . the two-year limitation applies retroactively to all cases not reduced to final judgment as of the new law's effective date." (*Id*. at p. 964; see *People v. Quinn* (2021) 59 Cal.App.5th 874 (*Quinn*).)

Following the reasoning in *Sims* and *Quinn*, we conclude that defendant is entitled to the benefit of the change to section 1203.1, subdivision (a). As such, we will order that his probationary sentence be reduced from three years to two. (*Quinn*, *supra*, 59 Cal.App.5th at p. 885.)

## DISPOSITION

The order granting probation is modified and reduced to two years. In all other respects, the judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

FIELDS
J.

We concur:

RAMIREZ
P. J.

McKINSTER
J.

11