Filed 3/26/25  P. v. Richardson CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>JUSTIN ALLAN RICHARDSON,<br><br>    Defendant and Appellant. | F087201<br><br>(Super. Ct. No. F21903972)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Fresno County. Alvin M. Harrell III, Judge.

Laura Arnold, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Kimberley A. Donohue, Assistant Attorney General, Ivan P. Marrs and Charlotte Woodfork, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

A jury found defendant Justin Allan Richardson guilty of kidnapping, battery against a spouse, false imprisonment by violence, and making criminal threats. The trial court found true the allegation that defendant suffered prior "strike" convictions within

the meaning of the "Three Strikes" law (Pen. Code,[1] §§ 667, subds. (b)–(i), 1170.12, subds. (a)–(d)) and a prior serious felony conviction (§ 667, subd. (a)). Declining to strike defendant's prior serious felony convictions, the court sentenced defendant to an aggregate term of 11 years.

Defendant argues on appeal: (1) his conviction for false imprisonment should be vacated as a prohibited lesser included offense of kidnapping; (2) his punishment for kidnapping or making criminal threats must be stayed under section 654; and (3) we must remand this case for resentencing to permit the trial court to exercise its sentencing discretion under section 654. We agree with defendant's first argument but not his second and third arguments. As modified, we affirm.

## PROCEDURAL HISTORY

On October 18, 2022, the Fresno County District Attorney filed an information charging defendant with corporal injury to a spouse (§ 273.5, subd. (a); count 1), kidnapping (§ 207, subd. (a); count 2), false imprisonment by violence (§ 236; count 3), and making criminal threats (§ 422; count 4). The prosecution further alleged prior serious felony convictions (§§ 667, subds. (b)–(i), 1170.12, subds. (a)–(d)).

On July 7, 2023, the jury found defendant not guilty of count 1 but convicted him of the lesser included offense of battery against a spouse, a misdemeanor (§ 243, subd. (e)(1)). The jury convicted defendant on the remaining counts as charged.

On September 29, 2023, the trial court sentenced defendant to an aggregate term of 11 years in prison.[2] Defendant timely appealed.

---

[1]     Undesignated statutory references are to the Penal Code.

[2]     Specifically, after denying defendant's request to strike his prior serious felony convictions, the trial court imposed (1) the mitigated term of three years for kidnapping, doubled to six years; (2) the five-year enhancement for defendant's prior serious felony convictions (§ 667, subd. (a)(1)), for a total term of 11 years, and (3) 16 months for each of counts 3 and 4, doubled to 32 months, to run concurrent to defendant's sentence for kidnapping.

2.

## BACKGROUND

On May 17, 2021, defendant and Jane Doe[3] attended a marital counseling session at around 4:00 p.m. due to ongoing marital issues. Those issues stemmed from defendant's frustration that Doe had friendships outside the marriage that meant she was not spending enough time with him. During the counseling session, defendant was "very angry." He accused Doe of "lying to the counselor to make him look bad and he was very agitated" toward Doe. At one point, he left the session, came back, and called her names.

After the approximately hour-long session, defendant and Jane Doe left in defendant's vehicle to go to a casino. Doe sat in the front passenger seat. Their dog was in the vehicle's back seat. As they drove, defendant renewed his accusations that Doe lied to the counselor and made him "look bad." Doe thought he was "general[ly] angry with [her]" and "irritated." On the way to the casino, defendant stopped at a "grocery store" and purchased a beer. He drank some of it in the vehicle while driving to the casino. The couple argued about defendant's drinking until they arrived at the casino.

Once they arrived at the casino, defendant "demanded" Doe to come in with him. Doe refused because defendant was upset, he had a history of being loud in public when angry, and their dog was in the vehicle. Doe remained in the vehicle when defendant went into the casino. After about 45 minutes to an hour, he returned angrier than when he went into the casino. He quickly approached the vehicle, got in, slammed the door, quickly backed the vehicle out, and asked Doe if she "was ready to die." At that point, Doe assessed whether she could get out of the car, or if defendant was simply saying that because he was angry.

Defendant repeatedly asked Doe if she was ready to die, yelling various forms of that question. Doe repeatedly responded, telling him to stop the vehicle and let her out,

---

[3] To protect the complaining witness's confidentiality, proceedings in the trial court utilized "Jane Doe" or "Doe."

and that they could talk about the situation. She unsuccessfully tried using a tactic that previously worked to calm him down. He drove erratically: honking at other vehicles and likely driving as fast as 70 miles per hour. Eventually, the vehicle reached an intersection. Instead of turning back toward Fresno, defendant turned toward Shaver Lake. When asked by Doe where he was going, defendant told her that he was "going to drive [them] off the cliff." All the while, Doe felt "terrified" that defendant would kill her. Though Doe believed defendant's threats before this point, she truly believed him "[e]specially once he turned left and went up to Shaver … I thought I was dead, I thought for sure I was dead."

Defendant began driving toward the highway's edge, then back, as they drove toward Shaver Lake, screaming at her the whole way. According to Doe, he struck her three times: once with his closed fist on Doe's jaw, again on her cheek, and another time on her mouth, busting her lip. He did not listen to Doe's requests to exit the vehicle. He also knocked Doe's phone out of her hand when she tried to call emergency services. Eventually, with the cliffside on the right and a mountain on the left, defendant lost control of the vehicle, collided with the mountain, and flipped the vehicle. Doe lost consciousness and when she regained consciousness, she observed defendant outside the vehicle screaming that he was going to jail.[4]

A California Highway Patrol officer, Fresno County Sheriff's deputies, and paramedics arrived at the scene. When interviewed by officers at the scene, Doe did not report that defendant struck her, his statements about killing her, or defendant's other erratic conduct because she was scared given defendant was nearby. Though she told an officer that she and defendant were fighting prior to the crash, defendant interrupted her before she was able to say anything more.

---

[4] The dog was not in the vehicle when Jane Doe awoke, but the dog survived the crash.

4.

The highway patrol officer interviewed defendant about the crash. Defendant stated he was travelling too fast around a curve in the road, lost control of the vehicle, and crashed. Defendant stated it was not intentional. The officer formed the opinion that, though defendant consumed alcohol, he was not over the legal limit. Defendant also informed the officer that he and Doe were in a verbal argument at the time of the crash.

A Fresno Sheriff's Department vehicle took Doe and defendant back to Fresno. The vehicle dropped them off at a gas station. After the law enforcement vehicle left, Doe arranged for transportation to her home, and defendant walked off on foot. Once home, Doe took her vehicle and immediately left. Eventually, she presented at an emergency room and informed staff that she did not feel safe at home. She recounted the events that led to the crash to hospital staff and requested they call law enforcement. Doe gave a statement to law enforcement at the hospital, and an officer photographed her physical injuries.

The same officer who interviewed Doe at the hospital interviewed defendant in the early morning after the night of the crash. Defendant recounted the counseling appointment and indicated he was upset with Doe for purportedly making the issues one-sided and blaming him for their problems. Defendant affirmed he argued with Doe in the vehicle before going to the casino. When asked why he went the wrong way after leaving the casino, defendant explained he was too angry to remember. He affirmed the argument continued after leaving the casino, and it was possible that he threatened Doe. He stated he could not remember whether Doe asked him to leave the vehicle because he was so angry. He also stated that it was possible he struck Doe when he threw his hand up during the crash. He also stated the crash was an accident because he was looking at Doe, not at the curve in the road.

After advising defendant of his charges, the officer walked with defendant to the patrol vehicle. Due to the crash and pain in defendant's foot, the officer took defendant to a hospital for medical clearance prior to booking him at the jail. While riding in the

5.

vehicle's back seat, defendant initiated a conversation.  He asked if there was some way to drop his charges or secure lesser charges.  Defendant then changed his statement, admitting that he struck Doe in the face.  He also admitted that he threatened to kill Doe because he was angry.

## DISCUSSION

### I.     Section 654

Defendant argues that the trial court erred by failing to (1) conduct a section 654 analysis and (2) stay defendant's sentence for making criminal threats because this conduct is inseparable from the conduct constituting the kidnapping.  We disagree.

#### A.     *Additional Background*

During closing argument, the prosecution relied upon the same conduct by defendant—his repeated threats to Jane Doe while in the vehicle—for the kidnapping and criminal threats charges.  As to the kidnapping charge, the prosecution did not argue that defendant detained Doe by physical force but rather reasonable fear through his repeated threats.  As to the criminal threats charge, the prosecution argued that defendant's repeated threats satisfied that charge's requirement that defendant threatened to unlawfully kill or cause great bodily injury to Doe.

During sentencing, the trial court remarked on the gravity of defendant's conduct: "[I]t was not lost on me the fear that [Doe] must have been going through as the cars [were] flying up the four lane, and there are statements being made that, I'm going to kill you, and the method of death is going to be plunging off a cliff.  I can't imagine that.  No one should go through that."  The court imposed the punishment for count 4 (criminal threats) concurrent with defendant's punishment for count 2 (kidnapping).  However, the court did not explain on the record why it did not exercise its discretion under section 654 to stay any of defendant's punishments.

**B.** *Analysis*

Section 654 provides: "An act or omission that is punishable in different ways by different provisions of law may be punished under either of such provisions, but in no case shall the act or omission be punished under more than one provision." (§ 654, subd. (a).) "[T]he purpose of section 654 is to ensure that a defendant's punishment will be commensurate with his culpability." (*People v. Correa* (2012) 54 Cal.4th 331, 341.)

Section 654 does not allow multiple punishments, including concurrent sentences, for the same conduct. (*People v. Deloza* (1998) 18 Cal.4th 585, 592.) Given this, imposition of concurrent sentences constitutes an implied finding that section 654 is inapplicable. (*People v. Alford* (2010) 180 Cal.App.4th 1463, 1468, citing *People v. Garcia* (2008) 167 Cal.App.4th 1550, 1564–1565 [" 'implicit in the trial court's concurrent sentencing order is that [the] defendant entertained separate intentions' "]; *People v. Jones* (2002) 103 Cal.App.4th 1139, 1147 [same].) Here, because the trial court imposed concurrent sentences for the kidnapping and making criminal threats convictions, we reject defendant's argument that the court erred by not making an explicit section 654 finding on the record. We deem the court impliedly rejected this finding by imposing concurrent sentences.

"A trial court's express or implied determination that two crimes were separate, involving separate objectives, must be upheld on appeal if supported by substantial evidence." (*People v. Brents* (2012) 53 Cal.4th 599, 618.) " 'The trial court has broad latitude in determining whether section 654, subdivision (a) applies in a given case.' " (*People v. Vasquez* (2020) 44 Cal.App.5th 732, 737.) Under this standard, we view the evidence in the light most favorable to the trial court's finding and presume the existence of every fact the trial court could reasonably deduce from the record. (*Ibid.*; *People v. DeVaughn* (2014) 227 Cal.App.4th 1092, 1113.) Where the facts are undisputed, section 654's applicability to the facts is a question of law. (*People v. Perez* (1979) 23 Cal.3d 545, 552, fn. 5.)

Section 654 "expressly prohibits separate punishment for two crimes based on the same act, but has been interpreted to also preclude multiple punishment for two or more crimes occurring within the same course of conduct pursuant to a single intent." (*People v. Vargas* (2014) 59 Cal.4th 635, 642; accord. *People v. Harrison* (1989) 48 Cal.3d 321, 335 (*Harrison*).)

Determining "[w]hether a defendant may be subjected to multiple punishment under section 654 requires a two-step inquiry." (*People v. Corpening* (2016) 2 Cal.5th 307, 311.) "We first consider if the different crimes were completed by a 'single physical act.' [Citation.] If so, the defendant may not be punished more than once for that act. Only if we conclude that the case involves more than a single act—i.e., a course of conduct—do we then consider whether that course of conduct reflects a single ' "intent and objective" ' or multiple intents and objectives." (*Ibid.*) Under this second step, "if the evidence discloses that a defendant entertained multiple criminal objectives which were independent of and not merely incidental to each other, he may be punished for the independent violations committed in pursuit of each objective even though the violations were parts of an otherwise indivisible course of conduct." (*People v. Perez*, *supra*, 23 Cal.3d at p. 551.)

This case does not involve a single physical act but a course of conduct: the kidnapping and repeated threats during the erratic drive toward Shaver Lake. We thus focus on the second step of section 654's analysis: consider whether the crimes constituted " 'a course of conduct deemed to be indivisible in time.' " (*Harrison*, *supra*, 48 Cal.3d at p. 335, quoting *People v. Beamon* (1973) 8 Cal.3d 625, 639.)

Generally, " '[w]hether *a course of criminal conduct* is divisible and therefore gives rise to more than one act within the meaning of section 654 depends on the *intent and objective* of the actor. If all of the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one.' " (*People v. Rodriguez* (2009) 47 Cal.4th 501, 507.) However, " '[b]ecause of the many

8.

differing circumstances wherein criminal conduct involving multiple violations may be deemed to arise out of an 'act or omission,' there can be no universal construction which directs the proper application of section 654 in every instance.' " (*People v. Hicks* (2017) 17 Cal.App.5th 496, 514, quoting *People v. Beamon*, *supra*, 8 Cal.3d at p. 636.) Section 654 "is intended to ensure that [the] defendant is punished 'commensurate with his culpability' " (*Harrison*, *supra*, 48 Cal.3d at p. 335), and our Supreme Court has cautioned that "a 'broad and amorphous' view of the single 'intent' or 'objective' needed to trigger the statute would impermissibly 'reward the defendant who has the greater criminal ambition with a lesser punishment' " (*id*. at pp. 335–336, quoting *People v. Perez*, *supra*, 23 Cal.3d at pp. 552–553).

Thus, " '[i]f [the defendant] entertained multiple criminal objectives which were independent of and not merely incidental to each other, he may be punished for independent violations committed in pursuit of each objective even though the violations shared common acts or were parts of an otherwise indivisible course of conduct.' " (*People v. Porter* (1987) 194 Cal.App.3d 34, 38; accord, *Harrison*, *supra*, 48 Cal.3d at p. 335; *People v. Tom* (2018) 22 Cal.App.5th 250, 260.) " 'The temporal proximity of the two offenses is insufficient by itself to establish that they were incident to a single objective.' " (*People v. Jackson* (2016) 1 Cal.5th 269, 354; accord, *Harrison*, at p. 335.) Objectives may be separate when "the objectives were either (1) consecutive even if similar or (2) different even if simultaneous." (*People v. Britt* (2004) 32 Cal.4th 944, 952, disapproved on another ground in *People v. Correa*, *supra*, 54 Cal.4th at p. 343, fn. 14; see *People v. Latimer* (1993) 5 Cal.4th 1203, 1211–1212.)

Here, the two crimes—the kidnapping and the criminal threats—are not consecutive. Given Doe was, initially, willingly in the vehicle, the kidnapping began when defendant began his threats and erratic driving and Doe requested to leave. (*People v. Hovarter* (2008) 44 Cal.4th 983, 1017–1018 [when a victim has voluntarily entered the defendant's car, the kidnapping occurs when force or fear compels her to be transported a

substantial distance against her will].)  The kidnapping ended at or after the crash. (*People v. Barnett* (1998) 17 Cal.4th 1044, 1159 [kidnapping continues until the victim is released or is otherwise disposed of and reaches a place of "temporary safety"].)  Defendant continued to make criminal threats during the kidnapping.

Section 654 thus only applies if defendant harbored multiple, different, non-incidental objectives.  Initially, it appears this was not the case.  The prosecution relied in its closing argument upon defendant's oral threats to establish both the reasonable fear element of kidnapping (§ 207, subd. (a)) and the threat of unlawful killing or great bodily injury element of making criminal threats (§ 422).  The prosecution's theory was apparently that the criminal threats were used to further the kidnapping.  Similarly, Doe testified that the kidnapping—defendant's erratic, dangerous driving and threats that compelled her to remain in the vehicle—solidified her belief that he would kill her.  The two crimes formed a symbiotic relationship, each furthering the other to apparently one end:  defendant's control of Doe through terror.

Nor did defendant, as in other cases, utilize criminal threats to advance a distinct objective.  (See *People v. Solis* (2001) 90 Cal.App.4th 1002, 1022 [crimes of making a criminal threat and arson were divisible under § 654 because the defendant had the distinct objectives of frightening the victim with the criminal threat and destroying property in the arson]; *People v. Nichols* (1994) 29 Cal.App.4th 1651, 1656–1658 [separate punishments for both kidnapping and threatening to kill the victim if he " 'open[ed] [his] mouth' " was permissible under § 654 because the defendant had separate objectives to (1) hijack a truck by kidnapping and robbing the victim and (2) avoid detection and conviction by dissuading and intimidating the victim].)

But defendant's conduct clearly escalated.  What began with non-specific threats to Doe's life turned into nearly realized threats of driving off a tangible cliff as they ascended the mountain.  By that point, defendant had already accomplished the kidnapping; though it had not ended, Doe was well within his control, fearful for her life.

10.

We are persuaded that the trial court could reasonably find that defendant's further threats after subduing Doe were gratuitous, forming a separate, elevated level of criminal intent.

*People v. Nguyen* (1988) 204 Cal.App.3d 181 (*Nguyen*), which enumerated the principle that "at some point the means to achieve an objective may become so extreme they can no longer be termed 'incidental' and must be considered to express a different and a more sinister goal than mere successful commission of the original crime," applies here. (*Id*. at p. 191.)

Other courts have applied the "gratuitous" test in cases factually like *Nguyen*. (See *People v. Ibarra* (2024) 106 Cal.App.5th 1070, 1083 [robbers' unexplained decision to shoot into shed containing unresisting victims sufficient to establish "gratuitous," separate criminal objective]; *People v. Bui* (2011) 192 Cal.App.4th 1002, 1016 [remand to exercise § 654 discretion for attempted murder, mayhem, and robbery convictions appropriate where the defendant continued to shoot victim after "he fell to the floor, face down, unable to move" during robbery]; *People v. Cleveland* (2001) 87 Cal.App.4th 263, 271–272 [sufficient evidence of divisible intents in committing robbery and attempted murder where the defendant repeatedly hit feeble, unresisting victim with a two-by-four, using far more force than necessary to achieve one objective].)

Though the conduct at issue, unlike that in the above cases, does not involve *physical* violence, the threat of death or great bodily injury "constitutes a crime of psychic violence." (*People v. Solis*, *supra*, 90 Cal.App.4th at p. 1024.) There was sufficient evidence that defendant's threats against Doe's life escalated beyond what was necessary to secure control of Doe. Although defendant had an overarching objective to ensure Doe's compliance with the kidnapping, defendant did not inherently relinquish any capability of committing separate and independent acts unnecessary for the kidnapping. Defendant's threats were not required to accomplish the kidnapping. He had already obtained Doe's compliance. "It is analogous to a needless or vicious assault committed after a robbery, which has long been held separately punishable and

distinguishable from an assault which is merely incidental to robbery." (*People v. Foster* (1988) 201 Cal.App.3d 20, 27–28.)

Though defendant's initial threats were possibly incidental to the kidnapping, the trial court could reasonably find that the subsequent threats made about driving off the cliff, while defendant drove erratically toward the cliff, "express[ed] a different and … more sinister goal than mere successful commission of the original crime" (*People v. Nguyen*, *supra*, 204 Cal.App.3d at p. 191), specifically, to magnify the already terrorizing ordeal. The court could reasonably determine that the subsequent threats were gratuitous. Thus, substantial evidence supported the court's imposition of a concurrent, unstayed sentence for the criminal threats offense.[5]

## II.    Lesser Included Offense

The parties agree that defendant's conviction for false imprisonment must be reversed because it is a lesser included offense of kidnapping. We also agree and reverse defendant's conviction for count 3.

### A.    *Additional Background*

The prosecutor argued in closing argument that defendant was guilty of both false imprisonment and kidnapping for the same conduct: refusing to stop the vehicle when the victim asked, refusing to let the victim out of the vehicle, and threatening to kill the victim by driving off a cliff, all while driving recklessly down a windy road.

After defendant's conviction, the prosecution's statement in aggravation argued, for count 3, "that the [section] 236 felony offense [for false imprisonment] is charged separately but it is a lesser included offense of [kidnapping under section] 207, charged in Count 2. Therefore, the People recommend the [trial c]ourt stay the punishment for Count 3, pursuant to [section] 654."

---

[5]    Given we uphold the trial court's implied exercise of its discretion to reject section 654's application, we reject defendant's request to remand this case for resentencing.

**B.** *Analysis*

"Although, ordinarily, a defendant 'may be convicted of any number of offenses charged' (§ 954), 'a judicially created exception to this rule prohibits multiple convictions based on necessarily included offenses.' " (*People v. Aranda* (2019) 6 Cal.5th 1077, 1089.)  "An offense is necessarily included within another if 'the statutory elements of the greater offense … include all the elements of the lesser offense….' " (*People v. Lewis* (2008) 43 Cal.4th 415, 518, overruled on other grounds in *People v. Black* (2014) 58 Cal.4th 912, 919.)

False imprisonment—" 'the unlawful violation of the personal liberty of another' " (§ 236)—occurs " 'when "the victim is 'compelled to remain where he does not wish to remain, or to go where he does not wish to go.' " ' " (*People v. Williams* (2017) 7 Cal.App.5th 644, 672.)  "A defendant guilty of kidnaping, as defined by either section 207 or 209 … must necessarily be guilty of the 'unlawful violation of the personal liberty of' his victim and therefore be guilty of false imprisonment as defined by section 236" (*People v. Morrison* (1964) 228 Cal.App.2d 707, 713), so long as the false imprisonment charge arises from the same act as the kidnapping.  (See *People v. Ratcliffe* (1981) 124 Cal.App.3d 808, 821 ["He who kidnaps a victim does so in order to restrain the personal liberty of his victim (Pen. Code, § 236), whatever his purpose may be for the false imprisonment (to rape, to rob, to obtain ransom, etc.)."].)  Here, forcing Doe to remain in the vehicle despite her requests to leave, constituted false imprisonment and formed an intrinsic part of the kidnapping.

We agree with the parties that defendant's false imprisonment conviction must be reversed as a lesser-included offense of the kidnapping conviction.

## DISPOSITION

We reverse defendant's conviction for false imprisonment (count 3).  As modified, we affirm the judgment.  We direct the trial court to prepare an amended abstract of

judgment reflecting the reversal of defendant's conviction for false imprisonment and to forward a certified copy of the amended abstract of judgment to all relevant authorities.

 

DE SANTOS, J.

WE CONCUR:


HILL, P. J.


MEEHAN, J.